STATE of Wisconsin, Plaintiff-Respondent,

v.

Omer NINHAM, Defendant-Appellant-Petitioner.

Supreme Court

*No 2008AP1139. Oral argument January 5, 2011.
—Decided May 20, 2011.*

2011 WI 33

(Also reported in 797 N.W.2d 451.)

337

340

For the defendant-appellant-petitioner there were briefs by *Frank M. Tuerkheimer* of *Godfrey & Kahn, S.C.*, and *Bryan Stevenson* of *Equal Justice Initiative*, and oral argument by *Bryan Stevenson*.

For the plaintiff-respondent the cause was argued by *Sally L. Wellman*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

Amicus curiae briefs were filed on behalf of Legal Assistance to Institutionalized Persons Project by *Byron C. Lichstein and the Frank J. Remington Center*, Madison, Counsel for Wisconsin Association of Criminal Defense Lawyers by *Robert R. Henak, Jake L. Remington and Henak Law Office, S.C.*, Milwaukee, Wisconsin Psychiatric Association and the Wisconsin Psychological Association by *G. Michael Halfenger, Linda M. Annoye, Kellen C. Kasper and Foley & Lardner, LLP*, Milwaukee, and Wisconsin Council on Children and Families by *Sarah A. Huck, Christopher R. Bub and Reinhart Boerner Van Deuren, S.C.*, Milwaukee.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J.   This is a review of a published decision of the court of appeals, *State v. Ninham*, 2009 WI App 64, 316 Wis. 2d 776, 767 N.W.2d 326, which affirmed an order of the Brown County Circuit Court[1] denying the defendant's post-conviction motion for sentencing relief under Wis. Stat. § 974.06 (2007–08).[2]

¶ 2.   A jury convicted the defendant Omer Ninham (Ninham) of first-degree intentional homicide and physical abuse of a child for the death of 13–year-old Zong Vang (Vang). Ninham was 14 years old at the time of the offense. The circuit court sentenced Ninham to life imprisonment without the possibility of parole.[3]

¶ 3.   Ninham mounts a categorical constitutional challenge, arguing that sentencing a 14–year-old to life imprisonment without parole is cruel and unusual in violation of the Eighth Amendment of the United States Constitution and Article I, Section 6 of the Wisconsin Constitution. In the alternative, Ninham seeks sentence modification on the grounds that (1) his sentence is unduly harsh and excessive; (2) new scientific research regarding adolescent brain development constitutes a new factor that frustrates the purpose of the sentence; and (3) the circuit court relied on an improper factor

---

[1] The Honorable John D. McKay presided.

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[3] On March 24, 2000, a jury found Ninham guilty of first-degree intentional homicide and physical abuse of a child. The crimes were committed on September 24, 1998, when Ninham was 14 years and 10 months old. Ninham was 16 years and 4 months old when he was convicted of the crimes. On June 29, 2000, when Ninham was sentenced for his conviction, he was 16 years and 7 months old.

when imposing the sentence. We disagree with Ninham on all four grounds, and accordingly, we affirm the decision of the court of appeals.

¶ 4. First, we hold that sentencing a 14–year-old to life imprisonment without the possibility of parole for committing intentional homicide is not categorically unconstitutional. We arrive at our holding by applying the two-step approach employed by the United States Supreme Court, most recently in *Graham v. Florida*, 130 S. Ct. 2011 (2010). First, we conclude that Ninham has failed to demonstrate that there is a national consensus against sentencing a 14–year-old to life imprisonment without parole when the crime is intentional homicide. Second, we conclude in the exercise of our own independent judgment that the punishment is not categorically unconstitutional.

¶ 5. In regard to Ninham's second argument, we conclude that his sentence of life imprisonment without the possibility of parole is not unduly harsh and excessive. Under the circumstances of this case, Ninham's punishment is severe, but it is not disproportionately so.

¶ 6. Third, we conclude that Ninham has not demonstrated by clear and convincing evidence that the scientific research on adolescent brain development to which he refers constitutes a "new factor." While the studies themselves may not have been in existence at the time of Ninham's sentencing, the conclusions they reached were widely reported.

¶ 7. Fourth, we conclude that Ninham has not demonstrated by clear and convincing evidence that the circuit court actually relied upon the religious beliefs of Vang's family when imposing Ninham's sentence.

345

## I. FACTUAL BACKGROUND

¶ 8. We describe the facts of this case with an understanding that this horrific and senseless crime cannot adequately be reduced into words. The terror experienced by the victim and the hurt suffered by his family and friends is, in a word, unimaginable.

¶ 9. On September 24, 1998, around dusk, 13–year-old Vang was bicycling home along Webster Avenue in Green Bay, Wisconsin. Vang's older brother had sent Vang to the grocery store for tomatoes. Vang was returning home on his bicycle, carrying a plastic grocery bag filled with tomatoes, when he was approached by five juveniles: 14–year-old Ninham, 13–year-old Richard Crapeau (Crapeau), 13–year-old Jeffrey P., 14–year-old Amanda G., and 14–year-old Christin J.

¶ 10. Ninham and the other four juveniles did not know or recognize Vang. Moreover, by all accounts, Vang never said or did anything to provoke the five juveniles. Rather, at the time, Crapeau was upset with his mother and "wanted to fight or see a fight." Consequently, Crapeau said to Ninham, "Let's mess with this kid," and Ninham responded, " 'I got your back,' meaning he would back [Crapeau] up in a fight."

¶ 11. Ninham and Crapeau began by verbally taunting Vang, while the other three juveniles "egg[ed]" them on. Ninham and Crapeau's assaults escalated into physical attacks. Crapeau bumped into Vang's shoulder and yanked his bicycle away from him. Crapeau also grabbed Vang's grocery bag out of his hands and threw it in the direction of St. Vincent's Hospital, located along the same street. When Vang asked for his bicycle back, Ninham punched Vang, knocking him down.

346

¶ 12. Vang got up and started running towards the nearby St. Vincent's Hospital parking ramp. All five juveniles chased after Vang, eventually catching up to him on the top, or fifth floor, of the parking ramp. When they caught up to him, Crapeau punched Vang in the face. Vang repeatedly asked why they were trying to hurt him and pleaded with them to leave him alone. Instead, Ninham and Crapeau began pushing Vang back and forth between them, in a game Jeffrey P. referred to as "chicken." Ninham punched Vang in the chest as he pushed him back and forth.

¶ 13. Ninham then pinned Vang by his wrists against the parking ramp's concrete wall. While Vang squirmed to get out of Ninham's grasp, Crapeau again punched Vang in the face. According to Crapeau, Vang was crying and screaming, " 'Let me go.' "

¶ 14. With Ninham still holding Vang by his wrists, Crapeau grabbed Vang's ankles. Ninham and Crapeau then began swinging Vang back and forth out over the parking ramp's concrete wall—a drop that measured nearly 45 feet to the ground. Vang was crying and screaming, begging Ninham and Crapeau not to drop him. While swinging Vang out over the wall, Crapeau let go of Vang's feet and told Ninham to "[d]rop him." Ninham let go of Vang's wrists, and in Crapeau's words, Vang "just sailed out over the wall."

¶ 15. At the same time, approximately 8:00 p.m., bystander Steven Heraly was in his vehicle exiting the St. Vincent's Hospital parking ramp when he heard what sounded like a "bag of wet cement hitting the pavement."

¶ 16. Vang landed on his back on the parking ramp's paved exit lane, 12 feet from the base of the ramp.

¶ 17. Rescue personnel, dispatched at 8:03 p.m., detected a faint pulse from Vang. Vang was transported to St. Vincent's Hospital where physicians were unable to revive him.

¶ 18. An autopsy revealed that Vang suffered a blunt impact to his head and trunk and died from craniocerebral trauma due to a fall from height.

¶ 19. Ninham and the other four juveniles never checked on Vang's condition and instead ran from the scene. Still, the Green Bay Police Department was able to focus its investigation on the five juveniles after some of them, in particular, Jeffrey P. and Amanda G., indicated to relatives and police that they knew who was responsible for Vang's death.

¶ 20. In his statement to police, Jeffrey P. described how Ninham stood for several seconds looking over the edge of the wall at Vang below. Ninham then looked at Jeffrey P. and said, "Don't say nothing. Better not say shit."

## II. PROCEDURAL POSTURE

¶ 21. On June 14, 1999, Ninham was charged with first-degree intentional homicide in violation of Wis. Stat. § 940.01(1) (1997–98) and physical abuse of a child contrary to Wis. Stat. § 948.03(2)(b) (1997–98), both as a party to a crime under Wis. Stat. § 939.05 (1997–98).[4] The charge of first-degree intentional homicide subjected Ninham to the jurisdiction of criminal court. See Wis. Stat. § 938.183(1)(am) (1997–98).[5]

---

[4] The State charged Crapeau with the same offenses, but he was tried separately. Crapeau's case is not before us.

[5] Wisconsin Stat. § 938.183(1)(am) (1997–98) provides, in relevant part, that "courts of criminal jurisdiction have exclu-

¶ 22. On October 13, 1999, prior to trial on the aforementioned charges, the State charged Ninham with one count of threat to a judge in violation of Wis. Stat. § 940.203(2) (1999–00) and three counts of intimidation of a witness in violation of Wis. Stat. § 940.43(3) (1999–00). The complaint alleged that while Ninham was detained in Brown County's juvenile detention facility, he threatened the life of Judge Richard J. Dietz, the circuit court judge then presiding over Ninham's case. The complaint further alleged that upon learning of the other juveniles' statements to police, Ninham threatened to conduct a "drive by" of Jeffrey P.'s house, to "rape and kill" Amanda G., and to arrange for the killing of Crapeau's sister.

¶ 23. On the initial charges of first-degree intentional homicide and physical abuse of a child, Ninham's case proceeded to a four-day jury trial. At trial, Ninham's defense was that he was not there on the parking ramp on the evening of September 24, 1998, and even if he was, he did not intend to drop Vang from the edge.[6] On

sive original jurisdiction over . . . (am) [a] juvenile who is alleged to have attempted or committed a violation of s. 940.01 . . . on or after the juvenile's 10th birthday, but before the juvenile's 15th birthday."

[6] Ninham provided varying statements to police regarding his involvement with and knowledge of Vang's death. Ninham first claimed that he and Vang were friends and had been "hoody-hopping," or stealing hood ornaments, together on the parking ramp when two people in a Cadillac chased them, thinking Ninham and Vang stole their hood ornament. Ninham told police that those two people might have killed Vang. Ninham later retracted that statement, admitting it was not true. Ninham then told police that he was in the area of St. Vincent's Hospital on September 24, 1998, because he wanted to visit his brother's baby. Ninham claimed, however, that he never made it inside the hospital and instead went over to his sister's

349

March 24, 2000, the jury convicted Ninham of both first-degree intentional homicide and physical abuse of a child.

¶ 24. The circuit court conducted a sentencing hearing on June 29, 2000. At the outset of the hearing, the State moved to dismiss the single count of threat to a judge and three counts of intimidation of a witness but asked that all four charges be read in.[7] The circuit court granted the State's motion.

---

house, where he drank heavily and was picked up for underage drinking and put into "detox." Ultimately, Ninham denied being anywhere near the St. Vincent's Hospital parking ramp on September 24, 1998.

In his closing argument, however, Ninham's counsel did not deny that Ninham was on the parking ramp with Vang and actually conceded the charge of physical abuse of a child:

[I]n terms of the abuse of a child, I'm not going to argue that. I think obviously there was some pushing back and forth, some punching going on. I don't know specifically when. There's been a little bit of disagreement as to who hit who and so forth, but I think that's a given. I think he helped in that. I think Omer participated in that.

But the question, and the tough question, is whether or not Omer Ninham formed the intent at age 14 to, in fact—in fact, kill Zong Vang. And it is our position, and I can't state it more strongly, that he did not, in fact, form that intent. Whether Ricky Crapeau did or not is not necessary, but he did not. Nor did he know what Ricky Crapeau was going to do.

Bad judgment? Bad juvenile? Bad a lot of things. But I don't think you can saddle Omer Ninham at this point from the facts and evidence on this record with intentional homicide.

[7] See Wis. Stat. § 973.20(1g)(b) (1999–00):

"Read-in crime" means any crime that is uncharged or that is dismissed as part of a plea agreement, that the defendant agrees to be considered by the court at the time of sentencing and that the court considers at the time of sentencing the defendant for the crime for which the defendant was convicted.

¶ 25.    The pre-sentence investigation (PSI) revealed that Ninham, by then 16 years old, continued to deny any involvement in Vang's homicide. Furthermore, the PSI explained that "[b]y all accounts, [] Ninham emanates from an extremely dysfunctional family structure," in which both of his parents and several of his siblings engage in severe substance abuse and domestic violence. The PSI described Ninham as a "serious substance abuser" who snorted cocaine on a weekly basis and, since grade school, drank alcohol every day, often alone, and usually to the point of unconsciousness. The PSI also revealed that Ninham, a member of the Menominee Indian Tribe, claimed to have a newfound interest in Native American spirituality.

¶ 26.    In addition, the PSI described the Vang family as devastated by the loss of their son and brother. Vang's parents indicated that they fled Laos and Thailand because they believed that the United States would be a safer and more prosperous country to raise their children; however, according to the Vangs, they fled evil only to discover it in a different place. Vang's parents further expressed that they had lost faith in the basic goodness of people and that their remaining children are fearful of leaving the safety of their home.

¶ 27.    Relevant to this case, at the sentencing hearing, Vang's brother, Seng Say Vang (Seng Say), gave a statement on behalf of Vang's family and friends. Seng Say asked the circuit court to impose on Ninham the maximum sentence of life imprisonment without parole, "the same brutal and merciless ultimatum as [Ninham] had given to Zong on September 24th, 1998." Seng Say then articulated to the circuit court a belief held by his family's Hmong culture:

> In our Hmong culture we believe that the spirit of
> a murdered person cannot be set free to go in peace

351

until the perpetrators be brought to justice. Therefore, we ask the Court, who is the only one to have the power to set free the spirit of our beloved son, brother, and friend, Zong, to go in peace by bringing Omer Ninham and his accomplices to justice.

¶ 28. Ninham also spoke at sentencing. He told the circuit court that he was sorry about Vang's death, but "[t]here wasn't nothing I could do. I wasn't there. I'm going to keep saying that until the day I die. I was not there, and that's the honest truth."

¶ 29. As to the count of first-degree intentional homicide, the circuit court sentenced Ninham to life imprisonment without the possibility of parole. For the count of physical abuse of a child, the circuit court sentenced Ninham to five years imprisonment, consecutive to the life sentence.

¶ 30. In imposing Ninham's sentence, the circuit court considered three primary factors: the gravity of the offense, the character of the offender, and the need to protect the public. First, the circuit court regarded the gravity of the offense as "beyond description" and indisputably "horrific." The circuit court noted that the offense has had an indescribable impact on Vang's family and friends and on the Green Bay community. Second, concerning the character of the offender, the circuit court "concede[d] for the sake of discussion that Omer Ninham is a child" but nevertheless described Ninham as "a frightening young man." The circuit court acknowledged that Ninham derives from a dysfunctional family but refused to let that excuse Ninham's conduct, explaining that Ninham is "a child of the street who knew what he was doing . . . ." Third, the circuit court reasoned that the community needs to be protected from Ninham: "Society needs to know, and espe-

cially this community needs to know, that you can send your child to the grocery store and expect to see him again."

¶ 31. In addition, the circuit court expressed amazement at the fact that Ninham continued to deny even being there on the evening of Vang's death. The circuit court recognized that alcohol was nearly a daily part of Ninham's existence but declined to view that as an excuse for his behavior, finding that Ninham chose not to take advantage of the opportunities he had to turn away from negative influences.

¶ 32. Finally, the circuit court commented on what it deemed "an interesting clash of cultures":

> I find it incredibly interesting and somewhat significant that not only am I being asked to impose a sentence in this matter, which is my obligation and my responsibility, but I'm being asked to release a soul. I have to comment on that because that's an interesting clash of cultures, and it's what we're all about as a people. We have to deal with those cultures and those clashes as positively as we can.

> And everything I know about you, Omer, and everything I've gleaned about you from your—from the information that's been provided to me, you dealt with those things [o]ppositionally. You weren't willing to let those cultures and those different ideas intermingle. It had to be your way or no way at all. That's too bad. And it's that attitude that you're going to have to change. . . .

> I would hope that you[] turn to spirituality. Native American spirituality gives you something to build on in that regard. It had better because I can tell you right now if your attitude and your ruthlessness and the perception that you have of your relationship to the community in which you are going to find yourself continues as it is, you're in for a real tough ride.

353

¶ 33. On November 16, 2000, Ninham filed an initial motion for post-conviction relief, the substance of which is not relevant here. The circuit court denied Ninham's motion, and in an unpublished decision, the court of appeals affirmed. *See State v. Ninham*, No. 2001AP716–CR, unpublished slip op. (Wis. Ct. App. Dec. 4, 2001).

¶ 34. On March 1, 2005, the United States Supreme Court decided *Roper v. Simmons*, 543 U.S. 551 (2005), concluding that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Id.* at 578.

¶ 35. Following the decision in *Roper*, on October 18, 2007, Ninham filed a motion for sentencing relief under Wis. Stat. § 974.06, arguing that his sentence of life imprisonment without parole violates the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 6 of the Wisconsin Constitution. In the alternative, on three other grounds, Ninham asked the circuit court to modify his sentence to make him eligible for parole. Ninham argued that (1) new scientific evidence relating to adolescent brain development constitutes a new factor that is relevant to the sentence imposed; (2) his sentence is unduly harsh and excessive; and (3) when sentencing Ninham, the circuit court improperly considered the religious beliefs of the victim's family.[8]

¶ 36. The circuit court denied Ninham's motion, declining to modify his sentence. With respect to the

[8] Ninham's 2007 post-conviction motion also included arguments that his initial post-conviction counsel was ineffective and that he is entitled to a new trial in the interest of justice. However, Ninham did not pursue those arguments on appeal, and accordingly, we do not address them.

354

constitutionality of sentencing a 14–year-old to life imprisonment without parole, the circuit court stated that it was bound to uphold the law as it currently stands. The circuit court determined that the holding in *Roper*, which concerns the constitutionality of subjecting a juvenile to capital punishment, is inapposite to Ninham's case.[9]

¶ 37.    The circuit court similarly rejected Ninham's alternative arguments for sentence modification. In regard to Ninham's claimed new factor, the circuit court failed to perceive any significant distinctions between the "new" scientific evidence cited by Ninham and the psychological evidence on adolescents cited by the Supreme Court in *Thompson v. Oklahoma*, 487 U.S. 815 (1988) (plurality opinion), 12 years before Ninham was

[9] Alternatively, the circuit court denied Ninham's motion on the grounds that Ninham was procedurally barred from raising his constitutional challenge for the first time in a subsequent post-conviction motion under Wis. Stat. § 974.06. *See* § 974.06(4); *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 181–82, 517 N.W.2d 157 (1994) ("[I]f the defendant's grounds for relief have been finally adjudicated, waived or not raised in a prior postconviction motion, they may not become the basis for a sec. 974.06 motion. The language of subsection (4) does not exempt a constitutional issue from this limitation, *unless* the court ascertains that a 'sufficient reason' exists for either the failure to allege or to adequately raise the issue in the original, supplemental or amended motion."). The circuit court noted that Ninham's § 974.06 motion neither addressed the procedural bar under § 974.06(4) nor provided any reasons as to why he failed to raise the constitutional challenge in his prior post-conviction motion.

The court of appeals did not address whether Ninham's constitutional challenge was procedurally barred under *Escalona-Naranjo*. Likewise, given the significance of the constitutional question before us, we choose not to resolve the issue on procedural grounds and instead proceed to the merits.

355

sentenced. In addition, the circuit court concluded that Ninham's sentence of life imprisonment without parole, while severe, was not unduly so, given the gravity of the crime and Ninham's aggravating conduct while awaiting sentencing. Finally, the circuit court determined that it did not improperly rely on the spiritual beliefs of Vang's family when sentencing Ninham; rather, according to the circuit court, it merely noted and appropriately considered the particular loss experienced by Vang's family and friends.

¶ 38. On March 3, 2009, the court of appeals affirmed the circuit court's order denying Ninham's post-conviction motion for sentencing relief. *Ninham*, 316 Wis. 2d 776. Like the circuit court, the court of appeals concluded that the Supreme Court's decision in *Roper* does not support Ninham's argument that sentencing a 14–year-old to life imprisonment without parole is unconstitutional. *Id.*, ¶ 4. Moreover, the court of appeals rejected Ninham's argument that his sentence was "unusual" under the Eighth Amendment, finding unhelpful the statistics Ninham provided of other juveniles arrested for homicide: "Ninham's crime was unusual for its senseless and extreme brutality. . . . The statistics Ninham provides do not establish that life without parole is a rare sentence for a juvenile whose crimes and character are comparable to his own." *Id.*, ¶ 5.

¶ 39. The court of appeals also rejected Ninham's three alternative arguments for sentence modification. The court of appeals concluded that "[t]he brutality of Ninham's crime and the additional offenses he committed after his arrest defeat the argument" that his sentence is unduly harsh and excessive. *Id.*, ¶ 8. In addition, the court of appeals denied that Ninham had established a new factor to support sentence modifica-

tion, concluding that at the time of sentencing, the circuit court was aware of the differences between juvenile and adult offenders, and a new physiological explanation for those differences is irrelevant to the sentence imposed. *Id.*, ¶ 9. Finally, the court of appeals rejected Ninham's argument that the circuit court relied on an improper factor when sentencing Ninham, finding that the religious reference was merely a comment on Ninham's intolerance. *Id.*, ¶ 10.

¶ 40.   Ninham petitioned this court for review. We stayed Ninham's petition for review pending the Supreme Court's decision in *Graham*, 130 S. Ct. 2011. In *Graham*, the Supreme Court held that the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Id.* at 2034. On September 13, 2010, we granted Ninham's petition for review.

## III.   ANALYSIS

¶ 41.   Ninham seeks sentence modification to allow for the possibility of parole. Ninham argues that sentencing a 14–year-old to life imprisonment without parole is categorically violative of the Eighth Amendment of the United States Constitution and Article I, Section 6 of the Wisconsin Constitution. Alternatively, Ninham argues that his sentence should be modified because (1) his sentence is unduly harsh and excessive; (2) new scientific research regarding adolescent brain development constitutes a new factor that frustrates the purpose of the sentence; and (3) the circuit court relied on an improper factor when imposing the sentence. We first address Ninham's categorical challenge, followed by his three alternative arguments.

357

A. Whether Sentencing a 14–Year-Old to Life Imprisonment Without Parole for Committing Intentional Homicide is Categorically Unconstitutional

¶ 42. The Wisconsin legislature has determined that a juvenile who commits first-degree intentional homicide on or after the juvenile's tenth birthday is subject to the criminal penalties provided for that crime. *See* Wis. Stat. § 938.183(1)(am), (1m) (1997–98). A person who commits first-degree intentional homicide is guilty of a Class A felony, Wis. Stat. § 940.01(1) (1997–98), the penalty for which is life imprisonment, Wis. Stat. § 939.50(3)(a) (1997–98). When a court sentences a person to life imprisonment for a crime committed on or after July 1, 1988, but before December 31, 1999, the court must make a parole eligibility determination. Wis. Stat. § 973.014(1) (1997–98). If the crime was committed on or after August 31, 1995, but before December 31, 1999, the court may choose the option of no parole eligibility. § 973.014(1)(c) (1997–98).[10]

---

[10] On December 31, 1999, 1997 Wis. Act 283, commonly referred to as Truth-in-Sentencing I (TIS-I), went into effect. *State v. Crochiere*, 2004 WI 78, ¶ 5, 273 Wis. 2d 57, 681 N.W.2d 524. TIS-I abolished parole and established instead a determinate sentencing structure. Michael B. Brennan & Donald V. Latorraca, *Truth-in-Sentencing*, Wis. Lawyer, May 2000, *available at* http://www.wisbar.org/AM/Template.cfm? Section = Wisconsin_Lawyer&template=/CM/ContentDisplay.cfm&contentid =49911 [hereinafter Brennan, *TIS*]. Pursuant to TIS-I, an offender who commits a felony on or after December 31, 1999, is subject to a bifurcated sentence: (1) an initial term of confinement in prison of at least one year; and (2) a term of extended supervision in the community, subject to conditions established by the court and the Department of Corrections. Wis. Stat. § 973.01(1), (2)(b) (1997–98); *see also* Brennan, *TIS*.

¶ 43. In this case, Ninham was adjudged guilty of committing the crime of first-degree intentional homicide on September 24, 1998, when he was 14 years old. Applying those circumstances to the above statutory scheme, there is no question that the circuit court was within its statutory authority to sentence Ninham to life imprisonment without the possibility of parole. Notwithstanding the statutory basis for his punishment, Ninham argues that sentencing a 14–year-old to life imprisonment without parole is cruel and unusual in violation of the Eighth Amendment of the United States Constitution and Article I, Section 6 of the Wisconsin Constitution. Stated otherwise, Ninham argues that the above statutory scheme is categorically unconstitutional when the crime was committed by a 14–year-old.[11]

The offender must serve the entire initial term of confinement in prison. § 973.01(4), (6) (1997–98); *see also* Brennan, *TIS*.

However, the bifurcated sentence structure under Wis. Stat. § 973.01 is not applicable to an offender who commits a felony punishable by life imprisonment. Wis. Stat. § 973.01(3) (1997–98). "[W]hen a court sentences a person to life imprisonment for a crime committed on or after December 31, 1999, the court shall make an extended supervision eligibility date determination regarding the person," in which one of the options available to the sentencing court is no eligibility for release to extended supervision. Wis. Stat. § 973.014(1g)(a)3. (1997–98).

In 2001, the legislature modified TIS-I with the enactment of 2001 Wis. Act 109, or Truth-in-Sentencing II (TIS-II). TIS-II went into effect on February 1, 2003. *Crochiere*, 273 Wis. 2d 57, ¶ 5.

[11] The dissent contends that this case does not involve an attack on the constitutionality of the abovementioned statutory scheme, which authorizes a sentence of life imprisonment without parole for a 14–year-old convicted of first-degree intentional homicide. Dissent, ¶ 107. The dissent's contention is

¶ 44.    The constitutionality of a statutory scheme is a question of law that we review de novo. *State v. Radke*, 2003 WI 7, ¶ 11, 259 Wis. 2d 13, 657 N.W.2d 66. Every legislative enactment is presumed constitutional. *Id.* As such, we will " 'indulge[] every presumption to sustain the law if at all possible, and if any doubt exists about a statute's constitutionality, we must resolve that doubt in favor of constitutionality.' " *State v. Cole*, 2003

contradicted by the dissent itself, which later "conclude[s] that the Wisconsin statute allowing the imposition of a death-in-prison sentence for a homicide committed when a juvenile is 14 years old violates the constitutional prohibition of cruel and unusual punishment." *Id.*, ¶ 133.

Citing this court's decision in *Tammy W-G v. Jacob T.*, 2011 WI 30, 333 Wis. 2d 273, 797 N.W.2d 854, the dissent further argues that we erroneously rely on the statutory scheme's presumption of constitutionality. *See* dissent, ¶ 111. We agree with the dissent that "an as-applied challenge contains no presumption in regard to whether the statute was applied in a constitutionally sufficient manner." *Tammy W-G*, 2011 WI 30, ¶ 49. However, Ninham's constitutional argument does not present an as-applied challenge. Rather, Ninham's constitutional argument presents a categorical challenge; specifically, Ninham argues that it is unconstitutional to sentence *any* 14-year-old to life imprisonment without parole. In contrast, in an as-applied challenge, the court considers whether a statute can be constitutionally applied to the facts of the particular defendant's case, "not hypothetical facts in other situations." *See State v. Hamdan*, 2003 WI 113, ¶ 43, 264 Wis. 2d 433, 665 N.W.2d 785.

Contrary to the dissent's belief, *see* dissent, ¶ 112, a presumption of constitutionality is deeply relevant in this case. As the Supreme Court made clear in *Gregg v. Georgia*, 428 U.S. 153, 175 (1976), the court must "presume" the validity of "a punishment selected by a democratically elected legislature," and "a heavy burden rests on those who would attack the judgment of the representatives of the people."

WI 112, ¶ 11, 264 Wis. 2d 520, 665 N.W.2d 328 (quoting *Aicher v. Wis. Patients Comp. Fund*, 2000 WI 98, ¶ 18, 237 Wis. 2d 99, 613 N.W.2d 849). Accordingly, the party challenging a statute's constitutionality faces a heavy burden. *Id.* The challenger must demonstrate that the statute is unconstitutional beyond a reasonable doubt. *State v. McGuire*, 2010 WI 91, ¶ 25, 328 Wis. 2d 289, 786 N.W.2d 227. In this case, Ninham faces the heavy burden of demonstrating that a punishment approved by the Wisconsin legislature, and thus presumably valid, is cruel and unusual in violation of the Eighth Amendment of the United States Constitution and Article I, Section 6 of the Wisconsin Constitution. *See Gregg v. Georgia*, 428 U.S. 153, 175 (1976) ("[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.").

¶ 45. The Eighth Amendment of the United States Constitution, applicable to the States through the Fourteenth Amendment,[12] guarantees individuals

---

[12] *See Robinson v. California*, 370 U.S. 660, 666–67 (1962); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (plurality opinion). The Fourteenth Amendment provides, in relevant part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

protection against excessive sanctions: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII; *see also Roper*, 543 U.S. at 560; *Atkins v. Virginia*, 536 U.S. 304, 311 (2002); *Thompson*, 487 U.S. at 818–19 & n.1. Article I, Section 6 of the Wisconsin Constitution contains substantively identical language: "Excessive bail shall not be required, nor shall excessive fines be imposed, nor cruel and unusual punishments inflicted." Generally, we interpret provisions of the Wisconsin Constitution consistent with the Supreme Court's interpretation of parallel provisions of the federal constitution. *State v. Arias*, 2008 WI 84, ¶ 19, 311 Wis. 2d 358, 752 N.W.2d 748. That is particularly true where, as here, the text of the provision in our state constitution is virtually identical to its federal counterpart, and no intended difference can be discerned. *See State v. Jennings*, 2002 WI 44, ¶ 39, 252 Wis. 2d 228, 647 N.W.2d 142 (citing *State v. Agnello*, 226 Wis. 2d 164, 180–81, 593 N.W.2d 427 (1999)). Thus, our analysis in this case is largely guided by the Supreme Court's Eighth Amendment jurisprudence and in particular, the cases concerning juvenile offenders.

¶ 46. The Eighth Amendment's prohibition against "cruel and unusual punishments" flows from the basic " 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " *Atkins*, 536 U.S. at 311 (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). According to the Supreme Court, the drafters of the Eighth Amendment did not attempt to define the contours of that proportionality, leaving to future generations of judges

the task of " 'discern[ing] how the framers' values, defined in the context of the world they knew, apply to the world we know.' " *See Thompson*, 487 U.S. at 821 & n.4 (quoting *Ollman v. Evans*, 750 F.2d 970, 995–96 (D.C. Cir. 1984) (en banc) (Bork, J., concurring)). As such, the Supreme Court has determined that a punishment is "cruel and unusual" in violation of the Eighth Amendment if it falls within one of two categories: (1) "those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted" in 1791; or (2) punishment inconsistent with " 'evolving standards of decency that mark the progress of a maturing society.' " *See Ford v. Wainwright*, 477 U.S. 399, 405–06 (1986) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)).

1. Whether sentencing a 14–year-old to life imprisonment without parole was considered cruel and unusual at the time the Bill of Rights was adopted

¶ 47. Ninham does not argue that sentencing a 14–year-old to life imprisonment without parole was considered cruel and unusual at the time the Bill of Rights was adopted. At common law, children ages seven and older were subjected to the same arrest, trial, and punishment as adult offenders, *In re Gault*, 387 U.S. 1, 16 (1967), which means that, theoretically, even the death penalty could have been imposed for a crime committed by a child as young as seven years old, *see Stanford v. Kentucky*, 492 U.S. 361, 368 (1989), *overruled by Roper*, 543 U.S. at 574; *see also Thompson*, 487 U.S. at 828 n.27 (reporting that a 10–year-old child was hanged in Louisiana in 1855 and another in Arkansas in 1885). Notably, once a child turned 14 years old, he or she no longer benefitted from the presumption of

incapacity to commit a capital, or any other, felony. *Stanford*, 492 U.S. at 368 (citing 4 William Blackstone, Commentaries *23–24); *Thompson*, 487 U.S. at 864 (Scalia, J., dissenting).

¶ 48.   Given the common law understanding that 14–year-olds were not immune from capital punishment, it is clear that Ninham cannot establish that sentencing a 14–year-old to life imprisonment without parole was considered cruel and unusual at the time the Bill of Rights was adopted. Therefore, in order to prevail on his constitutional challenge, he must demonstrate that sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide is contrary to "evolving standards of decency that mark the progress of a maturing society." *See Trop*, 356 U.S. at 101.

    2.    Whether sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide is inconsistent with evolving standards of decency

¶ 49.   In order to determine whether a punishment is cruel and unusual, the Supreme Court "look[s] beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." *Graham*, 130 S. Ct. at 2021 (internal quotations omitted); *see also Trop*, 356 U.S. at 100 ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards."). Accordingly, while the standard of "cruel and unusual" remains the same, " 'its applicability must change as the basic mores of society change.' " *Kennedy*

364

*v. Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, C.J., dissenting)).

¶ 50.　In cases, like this one, which implicate categorical Eighth Amendment rules, the Supreme Court engages in a two-step analysis. First, the Supreme Court considers " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 130 S. Ct. at 2022 (quoting *Roper*, 543 U.S. at 572). Second, notwithstanding the objective evidence of society's standards, the Supreme Court "determine[s] in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Id.* In this second step, guided by precedent and its own interpretation of the text, history, meaning, and purpose of the Eighth Amendment, *id.*, the Supreme Court "ask[s] whether there is reason to disagree with the judgment reached by the citizenry and its legislators," *Atkins*, 536 U.S. at 313.

a.　Whether there is a national consensus against sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide

¶ 51.　The determination of whether a punishment is proportionate to the offense under evolving standards of decency is best informed by "objective evidence of how our society views a particular punishment today." *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989), *overruled by Atkins*, 536 U.S. 304; *see also*

*Atkins*, 536 U.S. at 312 (providing that the evolving standards of decency "should be informed by objective factors to the maximum possible extent" (internal quotations omitted)). The Supreme Court regards the legislation enacted by the nation's legislatures as the " 'clearest and most reliable objective evidence of contemporary values.' " *Atkins*, 536 U.S. at 312 (quoting *Penry*, 492 U.S. at 331). However, to better inform its national consensus inquiry, the Supreme Court has looked beyond legislation to actual sentencing practices. *See Graham*, 130 S. Ct. at 2023.

¶ 52. For example, in *Roper*, in concluding that there is a national consensus against imposing the death penalty upon juvenile offenders, the Supreme Court noted that 30 of the 50 states prohibit the punishment: 12 states reject the death penalty altogether, and 18 states—while otherwise maintaining the death penalty—exclude juveniles from its reach. 543 U.S. at 564. In addition, the Supreme Court emphasized that "even in the 20 States without a formal prohibition on executing juveniles, the practice is infrequent." *Id.* In the ten years preceding *Roper*, only three states had executed prisoners for crimes committed as juveniles. *Id.* at 565.

¶ 53. More recently, in *Graham*, the Supreme Court determined that a national consensus has developed against the practice of sentencing a juvenile offender to life imprisonment without parole for committing a nonhomicide crime. 130 S. Ct. at 2026. The Supreme Court acknowledged that the majority of states, 37 and the District of Columbia, permit sentences of life without parole for juvenile nonhomicide offenders. *See id.* at 2023, 2034–35. Nevertheless, the Court maintained that " '[t]here are measures of consensus other than legislation,' " *id.* at 2023 (quoting

*Kennedy*, 554 U.S. at 433), and that an examination of actual sentencing practices in those 37 states reveals a consensus against the punishment, *id.* Specifically, the Supreme Court noted that just 11 of the 37 states in fact impose life without parole sentences upon juvenile nonhomicide offenders, and nationwide, only 123 juvenile offenders are serving life without parole sentences for nonhomicide crimes. *Id.* at 2024. Thus, according to the *Graham* Court, the fact that most states permit the punishment does not justify a conclusion that most states deem the punishment appropriate:

> [T]he many States that allow life without parole for juvenile nonhomicide offenders but do not impose the punishment should not be treated as if they have expressed the view that the sentence is appropriate. The sentencing practice now under consideration is exceedingly rare. And "it is fair to say that a national consensus has developed against it."

*Id.* at 2026 (quoting *Atkins*, 536 U.S. at 316).

¶ 54.  Turning to the case now before us, we must determine whether there is a national consensus against sentencing a 14-year-old to life imprisonment without the possibility of parole for committing intentional homicide. Given these facts, the Supreme Court's decision in *Graham* is instructive but not determinative. *See id.* at 2023 (clarifying that the national consensus established in *Graham* "concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense"). Importantly, the State does not have to establish a national consensus *approving* life without parole sentences for 14-year-olds who commit intentional homicide; rather, Ninham bears the heavy burden of establishing a national

367

consensus *against* the punishment. *See Stanford,* 492 U.S. at 373. We conclude that Ninham has failed to meet that burden.

¶ 55. Ninham concedes that the vast majority of states permit 14–year-olds to be sentenced to life without parole for homicide crimes. Regarding juvenile offenders generally, 44 states, the District of Columbia, and the federal government permit life without parole sentences for homicide crimes. *See Graham,* 130 S. Ct. at 2034–36. By our calculation, 36 of those 44 states permit life without parole sentences for offenders who were 14 years old or younger at the time of the offense.[13] *See* Amnesty International & Human Rights Watch, *The Rest of Their Lives: Life without Parole for Child Offenders in the United States,* 18 (Oct. 11, 2005), http://www.hrw.org/en/node/11578/section/4;[14] *Miller v. Alabama,* No. CR-06–0741, 2010 Ala. Crim. App. Lexis 77, at *15 (Ala. Crim. App. Aug. 27, 2010). Notably, seven states that generally except juvenile offenders from life without parole sentences still permit the sentence to be imposed upon juveniles who commit homicide. *Graham,* 130 S. Ct. at 2023, 2035. Thus,

---

[13] In response to a question posed at oral argument, Ninham's counsel advised the court that "about 30 states . . . have transfer statutes that expose children, some as young as 6 years of age, to sentences like life imprisonment without parole."

[14] The statistics compiled by Amnesty International and Human Rights Watch include Colorado and exclude Alabama in the list of states that, as of 2005, permit life without parole sentences for offenders who were 14 years old or younger at the time of the offense. However, according to our research, Alabama should be included in that list, *see Miller v. Alabama,* No. CR-06–0741, 2010 Ala. Crim. App. Lexis 77, at *11–12, 26 (Ala. Crim. App. Aug. 27, 2010), and Colorado should be excluded, *see* Colo. Rev. Stat. § 17–22.5–104(IV) (2010).

368

according to the " 'clearest and most reliable objective evidence of contemporary values,' " *Atkins*, 536 U.S. at 312 (quoting *Penry*, 492 U.S. at 331), we simply cannot say that a national consensus has developed against the practice of sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide. *See Roper*, 543 U.S. at 609 (Scalia, J., dissenting) ("Words have no meaning if the views of less than 50% of [] States can constitute a national consensus.").

¶ 56.  As Ninham points out, however, our analysis cannot end there; pursuant to *Graham*, it is possible that "an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use." 130 S. Ct. at 2023. Here, Ninham argues that the rarity with which sentences of life without parole are imposed upon 14–year-olds demonstrates a national consensus against such sentences. Ninham informs us that he is currently the only person in Wisconsin serving a sentence of life without parole for a crime committed at the age of 14, and furthermore, nationwide, only 73 juveniles age 14 or younger, deriving from just 18 states, have been sentenced to life without parole.

¶ 57.  We appreciate the fact that 14–year-olds are rarely sentenced to life imprisonment without parole. However, we disagree with Ninham that the rarity with which the sentence is imposed is necessarily demonstrative of a national consensus against the sentence. Rather, it is equally likely that 14–year-olds are rarely sentenced to life without parole because they rarely commit homicide and, more to the point, rarely commit homicide in the same horrific and senseless fashion as Ninham. Ninham does not point to any data which would lead us to believe otherwise. In short, Ninham has failed to demonstrate that there is a national

369

consensus against sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide.

¶ 58. Our conclusion that no such national consensus exists, "while 'entitled to great weight,' is not itself determinative" of the constitutional question before us. *Id.* at 2026 (quoting *Kennedy*, 554 U.S. at 434).[15] Because the task of interpreting the Eighth Amendment remains the court's responsibility, *see id.*, we must now exercise our own independent judgment to determine whether it is constitutional to impose a life without parole sentence upon a 14–year-old for committing intentional homicide.

b. The court's independent judgment regarding the constitutionality of sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide

■■

¶ 59. "The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Id.* In addition, the Supreme Court "considers whether the challenged sentencing practice serves legitimate penological goals." *Id.*

---

[15] *See also Kennedy v. Louisiana*, 554 U.S. 407, 434 (2008) ("As we have said in other Eighth Amendment cases, objective evidence of contemporary values as it relates to punishment for child rape is entitled to great weight, but it does not end our inquiry. 'The Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.' " (quoting *Coker v. Georgia*, 433 U.S. 584, 597 (1977) (plurality opinion))).

¶ 60. For example, in its 1988 *Thompson* decision, in concluding that the Eighth Amendment prohibits the execution of a person who was under 16 years of age at the time of the offense, a plurality of the Supreme Court determined, first, that "less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult," 487 U.S. at 835, and second, that the application of the death penalty to offenders 15 years old and younger does not measurably contribute to the goals that capital punishment is intended to achieve, *id.* at 838. The Supreme Court observed that the death penalty is intended to serve two principal social purposes: retribution and deterrence. *Id.* at 836. "Given the lesser culpability of the juvenile offender, the teenager's capacity for growth, and society's fiduciary obligations to its children," the Supreme Court concluded that the retribution rationale is "simply inapplicable to the execution of a 15-year-old offender." *Id.* at 836–37. Moreover, concerning the deterrent value of the death penalty, the Court determined that "[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 837.

¶ 61. Seventeen years later, in *Roper*, the Supreme Court extended its reasoning from *Thompson* to hold that the Eighth Amendment prohibits the imposition of the death penalty upon all juvenile offenders under the age of 18. *Roper*, 543 U.S. at 570–71. In so holding, the Supreme Court articulated three general differences between juvenile and adult offenders: (1) juveniles possess a lack of maturity and an underdeveloped sense of responsibility, qualities which often result in impulsive actions and decisions; (2) juveniles are more vulnerable or susceptible to negative influences

371

and peer pressure; and (3) a juvenile's character is not as well formed as that of an adult. *Id.* at 569–70. Those three differences, the Court concluded, "demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders" for which capital punishment is reserved. *Id.* at 569. The Court then echoed its determination in *Thompson* that, given the lesser culpability of juvenile offenders, the case for retribution and deterrence is simply not as strong with a minor as with an adult. *Id.* at 571–72. Of significance to this case, the Supreme Court observed: "To the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person." *Id.* at 572. The Supreme Court then affirmed the Missouri Supreme Court's decision to vacate the 17–year-old defendant's death sentence and resentence him to life imprisonment without eligibility for parole. *See id.* at 560, 578–79.

¶ 62. Last year, in *Graham*, finding no reason to reconsider its observations in *Roper* regarding juveniles, *see Graham*, 130 S. Ct. at 2026, the Supreme Court held that it is unconstitutional to impose a life without parole sentence upon a juvenile offender who did not commit homicide, *id.* at 2034.

¶ 63. Regarding the culpability of juvenile offenders, the *Graham* Court noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Id.* at 2026. Furthermore, the Court explicitly recognized that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 2027. Considering (1) the dimin-

ished culpability of juvenile offenders in general and (2) the diminished culpability of defendants who commit nonhomicide crimes, the Supreme Court reasoned that "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." *Id.*

¶ 64. Regarding the severity of the punishment, the *Graham* Court remarked on the similarities between life without parole sentences and death sentences, noting that the comparison is especially apparent when the sentences are imposed upon juveniles. *See id.* at 2027–28 ("Life without parole is an especially harsh punishment for a juvenile. . . . A 16–year-old and a 75–year-old each sentenced to life without parole receive the same punishment in name only.").

¶ 65. Finally, the *Graham* Court concluded that the four principal penological justifications for life without parole—retribution, deterrence, incapacitation, and rehabilitation—are inadequate to justify imposing the sentence upon juvenile nonhomicide offenders. *See id.* at 2028–30.

¶ 66. First, while acknowledging that retribution is a legitimate reason to punish, the Court explained that " 'the heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.' " *Id.* at 2028 (quoting *Tison v. Arizona*, 481 U.S. 137, 149 (1987)). Reiterating that juvenile offenders who did not commit homicide have twice diminished moral culpability, the Court concluded that "retribution does not justify imposing the second most severe penalty on the less culpable juvenile nonhomicide offender." *Id.*

¶ 67. Second, the *Graham* Court reaffirmed its determination in *Roper* that juveniles are less susceptible to deterrence because of their immaturity and

underdeveloped sense of responsibility. *Graham*, 130 S. Ct. at 2028. Moreover, according to the Supreme Court, any limited deterrent effect provided by life without parole is outweighed by the diminished moral responsibility of juveniles who commit nonhomicide crimes. *Id.* at 2029.

¶ 68.  Third, the Court concluded that incapacitation, or the imprisonment of dangerous criminals for the purpose of preventing recidivism, is inadequate to justify the punishment of life without parole for juveniles who did not commit homicide. *Id.* The Court reasoned that the penological theory behind incapacitation requires the sentencer to make a judgment that the defendant is incorrigible, or incapable of reform, but "[t]he characteristics of juveniles make that judgment questionable." *Id.* Furthermore, even if the state's judgment that a juvenile is incorrigible is later confirmed by the juvenile's misbehavior in prison, the Court ruled that the sentence of life without parole would still be disproportionate because the judgment was made at the outset, before the juvenile has a meaningful opportunity to demonstrate maturity. *Id.*

¶ 69.  Fourth, and finally, the Court determined that the penological goal of rehabilitation is inconsistent with a sentence of life imprisonment without parole, especially when imposed upon a juvenile nonhomicide offender who possesses the capacity for change and diminished moral culpability. *Id.* at 2029–30.

¶ 70.  In summary, (1) the limited culpability of juvenile nonhomicide offenders; (2) the severity of life without parole sentences; and (3) the Court's determination that penological theory is inadequate to justify the punishment all led to the *Graham* Court's conclusion that it is cruel and unusual to impose a life without

374

parole sentence upon a juvenile offender who did not commit homicide. *Id.* at 2030.

¶ 71.   Turning to the case now before this court, we must determine, in the exercise of our own independent judgment, whether it is categorically unconstitutional to impose a life without parole sentence upon a 14–year-old for committing intentional homicide. Stated otherwise, we must determine whether the Eighth Amendment and Article I, Section 6 of the Wisconsin Constitution prohibit a sentencing court from *ever* concluding that a 14–year-old who commits intentional homicide is deserving of life imprisonment without the possibility of parole. We conclude that the answer is no.

¶ 72.   Following the approach set forth in *Graham*, *see id.* at 2026, we first consider the culpability of 14–year-olds who commit intentional homicide and the severity of life imprisonment without parole. We then consider whether sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide serves legitimate penological goals.

    i.   The culpability of 14–year-olds who commit intentional homicide and the severity of life imprisonment without parole

¶ 73.   Ninham argues that the characteristics of juveniles articulated in *Roper* and reiterated in *Graham* apply with even greater force to juveniles age 14 and younger. As Ninham points out, the Supreme Court has held that these general characteristics "demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders" for which the most severe punishment is reserved. *Roper*, 543 U.S. at 569; *see also Graham*, 130 S. Ct. at 2026 ("*Roper* established

that because juveniles have lessened culpability they are less deserving of the most severe punishments."). It follows, Ninham argues, that 14–year-olds cannot reliably be classified among the worst offenders for which this state reserves life imprisonment without parole.

¶ 74.  We do not disagree that, typically, juvenile offenders are less culpable than adult offenders and are therefore generally less deserving of the most severe punishments. *See Graham*, 130 S. Ct. at 2026 (citing *Roper*, 543 U.S. at 569–70). Furthermore, we do not dispute Ninham's argument that, on average, the younger the juvenile offender, the more his or her culpability diminishes. However, the constitutional question before us does not concern only the typical 14–year-old offender. Rather, the question before us concerns *all* 14–year-old offenders, typical or atypical, who commit intentional homicide. Given these facts, we disagree with Ninham that *Roper* and *Graham* lead to the conclusion that 14–year-olds who commit intentional homicide are categorically less deserving of life imprisonment without parole.

¶ 75.  In *Roper*, recognizing that capital punishment, the most severe penalty recognized by law, must be limited to a narrow class of offenders who commit only the most serious crimes and "whose extreme culpability makes them 'the most deserving of execution,' " 543 U.S. at 568 (quoting *Atkins*, 536 U.S. at 319), the Supreme Court concluded that the diminished culpability of juvenile offenders renders them categorically less deserving of the death penalty. *Id.* at 569–71. *Roper* does not, however, stand for the proposition that the diminished culpability of juvenile offenders renders them categorically less deserving of the second most severe penalty, life imprisonment without parole. Indeed, the *Roper* Court affirmed the Missouri Supreme Court's

376

decision to modify the 17–year-old defendant's death sentence to life imprisonment without eligibility for parole. *Id.* at 560, 578–79.

¶ 76.   In *Graham*, the Supreme Court concluded that the "twice diminished moral culpability" of (1) juvenile offenders who (2) do not commit homicide renders that particular class of offenders categorically less deserving of life imprisonment without parole. 130 S. Ct. at 2027. *Graham* does not, however, support the argument that juvenile offenders who commit homicide are categorically less deserving of life imprisonment without parole. This is because juvenile offenders who commit homicide lack the second layer of diminished moral culpability on which the *Graham* Court based its conclusion. Simply stated, "[t]here is a line between homicide and other serious violent offenses against the individual. . . . Although an offense like robbery or rape is a serious crime deserving serious punishment, those crimes differ from homicide crimes in a moral sense." *Id.* (internal quotations and citations omitted).

¶ 77.   It follows, therefore, that neither *Roper* nor *Graham* foreclose a sentencing court from concluding that a juvenile who commits homicide is sufficiently culpable to deserve life imprisonment without the possibility of parole.

¶ 78.   Furthermore, contrary to Ninham's contention, we are not convinced that juveniles 14 years old and younger are a distinct group of juveniles such that a different constitutional analysis applies. Ninham directs us to developments in psychology and brain science tending to show that 14–year-olds, in comparison to older teenagers, are generally less capable of respon-

sible decision-making,[16] generally possess a heightened vulnerability to risk-taking and peer pressure,[17] and generally have a less mature sense of self and a decreased ability to imagine their futures.[18] Even assuming that such psychological and scientific research is constitutionally relevant, the generalizations concluded therein are insufficient to support a determination that 14–year-olds who commit homicide are never culpable enough to deserve life imprisonment without parole. Case in point, in other contexts, psychologists have promoted scientific evidence that arrives at the precise opposite conclusions about 14–year-olds, namely, that they understand social rules and laws and possess the ability to take moral responsibility for their actions. *See Roper*, 543 U.S. at 617–18 (Scalia, J., dissenting) (explaining that in an amicus brief filed in *Hodgson v. Minnesota*, 497 U.S. 417 (1990), the American Psychological Association cited numerous psychological treatises and studies tending to demonstrate that 14 and 15–year-old juveniles are mature enough to decide whether to obtain an abortion without parental involvement). In summary, Ninham has failed to demonstrate that 14–year-olds who commit intentional homicide cannot reliably be classified among those offenders deserving of life imprisonment without parole.

---

[16] *See, e.g.*, B. Luna, *The Maturation of Cognitive Control and the Adolescent Brain*, in *From Attention to Goal-Directed Behavior* 249, 252–56 (F. Aboitiz & D. Cosmelli eds., 2009).

[17] *See, e.g.*, Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 5 Ann. Rev. Clinical Psychol. 459, 466 (2009); Laurence Steinberg, *Risk-Taking in Adolescence: New Perspectives from Brain and Behavioral Science*, 16 Current Directions in Psychol. Sci. 55, 56–58 (2007).

[18] *See, e.g.*, Laurence Steinberg & Elizabeth Cauffman, *Maturity of Judgment in Adolescence*, 20 L. & Human Behav. 249, 255 (1996).

ii. Whether sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide serves legitimate penological goals

¶ 79.   Relying in large part on the Supreme Court's analysis in *Graham*, Ninham maintains that none of the four generally recognized penological justifications are adequate to justify imposing life without parole upon a 14–year-old. However, as previously described, much of the *Graham* Court's analysis on penological theory was based upon the twice diminished moral culpability of juvenile offenders who commit nonhomicide crimes.j *See, e.g.*, 130 S. Ct. at 2028 ("The case [for retribution] becomes even weaker with respect to a juvenile who did not commit homicide."); *id.* at 2029 ("[I]n light of juvenile nonhomicide offenders' diminished moral responsibility, any limited deterrent effect provided by life without parole is not enough to justify the sentence."). As we just explained, we are not convinced that 14–year-olds who commit homicide have the same diminished moral culpability as those juvenile offenders who do not commit homicide. Accordingly, we conclude that sentencing a 14–year-old to life imprisonment without parole for committing intentional homicide serves the legitimate penological goals of retribution, deterrence, and incapacitation. *See Harmelin v. Michigan*, 501 U.S. 957, 999 (1991) (Kennedy, J., concurring) ("[T]he Eighth Amendment does not mandate adoption of any one penological theory.").

¶ 80.   First, retribution, as " 'an expression of society's moral outrage at particularly offensive conduct,' " *Thompson*, 487 U.S. at 836 (quoting *Gregg*, 428 U.S. at 183), is a legitimate penological justification for

imposing a sentence of life without parole upon a 14–year-old who commits intentional homicide. " 'The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.' " *Graham*, 130 S. Ct. at 2028 (quoting *Tison*, 481 U.S. at 149). While juvenile offenders are generally less culpable than adult offenders and therefore generally less deserving of the most severe punishments, *id.* at 2026, the case for retribution increases with respect to imposing a life without parole sentence upon a juvenile who intentionally takes the life of another, *see id.* at 2028.

¶ 81.   Second, as the Supreme Court recognized in *Roper*, "the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person" and thus serves as an adequate deterrent to potential juvenile homicide offenders. 543 U.S. at 572.

¶ 82.   Third, and finally, we conclude that incapacitation adequately justifies imposing the punishment of life without parole upon 14–year-old juveniles who commit intentional homicide. We recognize that incapacitation requires the sentencing court to make a judgment that the defendant is incorrigible, and the nature of juveniles generally make that judgment a difficult one. *See Graham*, 130 S. Ct. at 2029. Nevertheless, we cannot preclude sentencing courts from ever making a judgment that a 14–year-old who commits intentional homicide is forever dangerous. As recognized by the Supreme Court, while many juveniles commit crimes that "reflect[] unfortunate yet transient immaturity," the rare juvenile is capable of committing a crime that "reflects irreparable corruption." *Roper*, 543 U.S. at 573. In the case of those rare juveniles, a sentence of life imprisonment without parole measurably contributes to the legitimate goal of incapacitation.

¶ 83. In summary, in the exercise of our own independent judgment, we conclude that sentencing a 14–year-old to life imprisonment without the possibility of parole for committing intentional homicide is not categorically unconstitutional. We therefore confirm what objective evidence already informs us: contemporary society views the punishment as proportionate to the offense.

### B. Whether Ninham's Sentence is Unduly Harsh and Excessive

¶ 84. Ninham argues that even if we conclude that it is not categorically unconstitutional to sentence a 14–year-old to life imprisonment without parole for committing intentional homicide, he is still entitled to sentence modification on the grounds that his particular punishment is cruel and unusual in violation of the Eighth Amendment and Article I, Section 6 of the Wisconsin Constitution. Specifically, Ninham argues that his sentence of life imprisonment without parole is unduly harsh and excessive because his culpability was diminished, both by the fact that he was just 14 years old at the time of the offense and by the fact that extreme abuse and alcohol dependence resulted in his underdevelopment.

¶ 85. The standard for determining whether a punishment is cruel and unusual in a particular case is the same under both federal and Wisconsin law. *See State v. Pratt*, 36 Wis. 2d 312, 321–23, 153 N.W.2d 18 (1967). " '[W]hat constitutes adequate punishment is ordinarily left to the discretion of the trial judge. If the sentence is within the statutory limit, appellate courts will not interfere unless clearly cruel and unusual.' " *Id.*

381

at 322 (quoting *Hayes v. United States*, 238 F.2d 318, 322 (10th Cir. 1956)); *see also State v. Taylor*, 2006 WI 22, ¶ 19, 289 Wis. 2d 34, 710 N.W.2d 466. A sentence is clearly cruel and unusual only if the sentence is "so 'excessive and unusual, and so disproportionate to the offense committed, as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances.'" *State v. Paske*, 163 Wis. 2d 52, 69, 471 N.W.2d 55 (1991) (quoting *Pratt*, 36 Wis. 2d at 322).

¶ 86.   Under these circumstances, we simply cannot say that Ninham's sentence of life imprisonment without parole is so disproportionate to the crime he committed " 'as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper.'" *Id.* (quoting *Pratt*, 36 Wis. 2d at 322). There is no question that Ninham's punishment is severe, but it is not disproportionately so. The manner in which Ninham took Vang's life was horrific and senseless. The severity of the homicide was only compounded by the fact that Ninham refused to take any responsibility and in fact threatened the lives of the other juveniles who did. That Ninham was just 14 years old at the time of the offense and suffered an indisputably difficult childhood does not, as he contends, automatically remove his punishment out of the realm of proportionate. The circuit court was well within its statutory authority to sentence Ninham to life imprisonment without parole, and we will not interfere with its exercise of discretion.

C.   Whether a New Factor Warrants
Sentence Modification

¶ 87.   Ninham also argues that he is entitled to sentence modification on the grounds that new scien-

tific research regarding adolescent brain development constitutes a new factor that frustrates the purpose of his sentence. Specifically, Ninham directs us to magnetic resonance imaging (MRI) studies, apparently unavailable at the time Ninham was sentenced, which tend to show that the brain is not fully developed early in childhood and that making impulsive decisions and engaging in risky behavior is an inevitable part of adolescence.[19] The studies further explain, according to Ninham, that as the brain matures, adolescents almost universally grow out of their impulsive and risky behavior. In addition, Ninham informs us that a growing body of research suggests that alcohol causes more damage to developing teenage brains than previously thought.[20] According to Ninham, this new scientific research on adolescent brain development undermines the circuit court's findings regarding Ninham's culpability and recidivism.

¶ 88.   In order to prevent the continuation of unjust sentences, the circuit court has inherent authority to modify a sentence. *State v. Trujillo*, 2005 WI 45, ¶ 10, 279 Wis. 2d 712, 694 N.W.2d 933. "However, a circuit court's inherent authority to modify a sentence is a discretionary power that is exercised within defined parameters." *State v. Crochiere*, 2004 WI 78, ¶ 12, 273 Wis. 2d 57, 681 N.W.2d 524. Included within those defined parameters is the circuit court's inherent au-

---

[19] *See, e.g.*, L.P. Spear, *The Adolescent Brain and Age-Related Behavioral Manifestations*, 24 Neurosci. & Biobehav. Rev. 417, 421 (2000); N. Dickon Reppucci, *Adolescent Development and Juvenile Justice*, 27 Am. J. Community Psychol. 307, 319 (1999).

[20] *See, e.g.*, Katy Butler, *The Grim Neurology of Teenage Drinking*, N.Y. Times, July 4, 2006, at F1.

thority to modify a sentence based upon the showing of a new factor. *Id.* In *Rosado v. State*, 70 Wis. 2d 280, 288, 234 N.W.2d 69 (1975), this court defined what constitutes a "new factor":

> [T]he phrase "new factor" refers to a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties.

¶ 89. The defendant bears the burden of demonstrating by clear and convincing evidence that a new factor exists. *State v. Franklin*, 148 Wis. 2d 1, 9–10, 434 N.W.2d 609 (1989). However, the existence of a new factor does not necessarily entitle the defendant to sentence modification. *Trujillo*, 279 Wis. 2d 712, ¶ 11. Rather, whether sentence modification is warranted is left to the sound discretion of the circuit court. *Id.* In determining whether to exercise its discretion to modify a sentence on the basis of a new factor, the circuit court may, but is not required to, consider whether the new factor frustrates the purpose of the original sentence. *See State v. Harbor*, 2011 WI 28, ¶¶ 48–52, 333 Wis. 2d 53, 797 N.W.2d 828.

¶ 90. Whether a new factor exists is a question of law that this court reviews independently. *Trujillo*, 279 Wis. 2d 712, ¶ 11. However, even if we determine that a new factor exists, we will not overrule a circuit court's decision regarding sentence modification unless the circuit court erroneously exercised its discretion. *Id.*

¶ 91. In this case, we conclude that Ninham has not demonstrated by clear and convincing evidence that a new factor exists. Assuming that the MRI studies themselves were not in existence at the time Ninham was sentenced, we agree with the circuit court that the studies still do not constitute "a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of the original sentencing," *Rosado*, 70 Wis. 2d at 288, because the conclusions reached by the studies were already in existence and well reported by the time Ninham was sentenced in 2000.

¶ 92. This point is best made by considering the same Supreme Court jurisprudence we have followed throughout this opinion. In *Thompson*, a 1988 decision, the Supreme Court referred to a 1978 report by a task force on sentencing young offenders to make clear that "the Court ha[d] already endorsed" the proposition that juvenile offenders under the age of 16 are less culpable than adult offenders:

> The basis for this conclusion is too obvious to require extended explanation. Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult.

487 U.S. at 834–35. In *Roper*, the Supreme Court adopted that reasoning of the *Thompson* Court and applied it to all juvenile offenders under the age of 18. *See Roper*, 543 U.S. at 570–71. Finally, and of most relevance to the "new factor" issue before us, in *Graham*, a 2010 decision, the Supreme Court observed that "[n]o recent data provide reason to reconsider the

385

Court's observations in *Roper* about the nature of juveniles. . . . *[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.*" 130 S. Ct. at 2026 (emphasis added). Thus, as plainly recognized by the *Graham* Court, the "new" scientific research regarding adolescent brain development to which Ninham refers only confirms the conclusions about juvenile offenders that the Supreme Court had "already endorsed" as of 1988. *See Thompson*, 487 U.S. at 835.

¶ 93. Moreover, even assuming that the conclusions reached by these MRI studies were not known to the circuit court at the time of Ninham's sentencing, Ninham still has not shown by clear and convincing evidence that the conclusions reached by the studies are "*highly relevant* to the imposition of [Ninham's] sentence," *see Rosado*, 70 Wis. 2d at 288 (emphasis added), and in particular, the circuit court's findings regarding Ninham's culpability and recidivism. As previously explained, *see* Part III.A.2.b.i. *supra*, the generalizations concluded within these scientific studies are insufficient to support a determination about the culpability of a particular 14–year-old who commits intentional homicide, in this case, Ninham. Likewise, the studies' conclusion that adolescents "almost universally" grow out of their impulsive and risky behavior tells us virtually nothing about Ninham's likelihood to relapse into criminal behavior. This point is made clear by the fact that the studies to which Ninham refers do not concern the development of incarcerated juveniles in particular.[21] In short, Ninham has failed to prove by

[21] *See, e.g.*, Barry Holman & Jason Ziedenberg, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Facilities*, 2–3 (Nov. 28, 2006),

clear and convincing evidence that this scientific research regarding adolescent brain development constitutes a new factor for purposes of modifying Ninham's particular sentence.

### D. Whether the Circuit Court Relied on an Improper Factor When Imposing Ninham's Sentence

¶ 94. Finally, Ninham seeks sentence modification on the grounds that the circuit court relied on an improper factor when imposing his sentence. Specifically, Ninham argues that the circuit court improperly based Ninham's sentence on the religious views of Vang's family. Ninham directs us to the point in the sentencing transcript in which the circuit court noted, "I find it incredibly interesting and somewhat significant that not only am I being asked to impose a sentence in this matter, which is my obligation and my responsibility, but I'm being asked to release a soul."

¶ 95. Our review of a sentencing determination is limited to whether the circuit court erroneously exercised its discretion. *State v. Harris*, 2010 WI 79, ¶ 30, 326 Wis. 2d 685, 786 N.W.2d 409. A circuit court erroneously exercises its discretion when it "imposes its sentence *based on* or in *actual reliance upon* clearly irrelevant or improper factors." *Id.* The defendant bears the burden of demonstrating by clear and convincing

http://www.justicepolicy.org/research/1978 ("[T]here is credible and significant research that suggests that the experience of detention may make it more likely that youth will continue to engage in delinquent behavior, and that the detention experience may increase the odds that youth will recidivate, further compromising public safety.").

evidence that the circuit court actually relied upon an improper factor when imposing the defendant's sentence. *Id.*, ¶ 34.

¶ 96.  We agree with Ninham that a circuit court may not base its sentencing decision upon the defendant's or the victim's religion. However, in this case, Ninham has failed to demonstrate by clear and convincing evidence that the circuit court actually relied upon the religious views of Vang's family when imposing Ninham's sentence. There is no doubt that the circuit court's comment on "being asked to release a soul" was a reference to the statement provided by Vang's brother, Seng Say, in which he informed the court that "[i]n our Hmong culture we believe that the spirit of a murdered person cannot be set free to go in peace until the perpetrators be brought to justice." However, other than pointing out the link between the circuit court's comment and Seng Say's statement, Ninham offers no argument to support the circuit court's actual reliance upon the Vangs' Hmong beliefs. Rather, when the circuit court's comment is considered in context, it is clear that the circuit court was not actually relying upon the Vangs' religious beliefs but instead was merely commenting on Ninham's character, namely, his intolerance of other cultures and his negative attitude:

> I'm being asked to release a soul. I have to comment on that because that's an interesting clash of cultures, and it's what we're all about as a people. . . .
>
> And everything I know about you, Omer, and everything I've gleaned about you from your—from the information that's been provided to me, you dealt with those things [o]ppositionally. You weren't willing to let

those cultures and those different ideas intermingle. It had to be your way or no way at all.

The character of the offender is among the primary factors that a circuit court must consider when imposing a sentence. *Paske*, 163 Wis. 2d at 62. In addition, to the extent that the circuit court commented on the unique and particularized impact felt by Seng Say and his family, that too was an appropriate consideration: " 'A statement from the victims about how the crime affected their lives is relevant to one of the considerations that a judge must take into account at sentencing —the gravity of the crime.' " *State v. Gallion*, 2004 WI 42, ¶ 65, 270 Wis. 2d 535, 678 N.W.2d 197 (quoting *State v. Voss*, 205 Wis. 2d 586, 595, 556 N.W.2d 433 (Ct. App. 1996)).

## IV.  CONCLUSION

¶ 97.  First, we hold that sentencing a 14–year-old to life imprisonment without the possibility of parole for committing intentional homicide is not categorically unconstitutional. We arrive at our holding by applying the two-step approach employed by the United States Supreme Court, most recently in *Graham*, 130 S. Ct. 2011. First, we conclude that Ninham has failed to demonstrate that there is a national consensus against sentencing a 14–year-old to life imprisonment without parole when the crime is intentional homicide. Second, we conclude in the exercise of our own independent judgment that the punishment is not categorically unconstitutional.

¶ 98.  In regard to Ninham's second argument, we conclude that his sentence of life imprisonment without the possibility of parole is not unduly harsh and exces-

sive. Under the circumstances of this case, Ninham's punishment is severe, but it is not disproportionately so.

¶ 99. Third, we conclude that Ninham has not demonstrated by clear and convincing evidence that the scientific research on adolescent brain development to which he refers constitutes a "new factor." While the studies themselves may not have been in existence at the time of Ninham's sentencing, the conclusions they reached were widely reported.

¶ 100. Fourth, we conclude that Ninham has not demonstrated by clear and convincing evidence that the circuit court actually relied upon the religious beliefs of Vang's family when imposing Ninham's sentence.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 101. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). The Eighth Amendment cruel and unusual punishment issue before this court is easy to state and difficult to decide. The question before the court is the constitutionality of imposing a death-in-prison sentence on a 14–year-old juvenile boy who committed an intentional, brutal, senseless, grotesque, reprehensible murder of a 13–year-old innocent stranger.

¶ 102. In Wisconsin, both the adult offender and the juvenile offender (10 years old or older) who have committed first degree intentional homicide are treated the same: the maximum penalty is a death-in-prison sentence, that is, life in prison without the possibility of parole. The circuit court need not impose this maximum sentence. It did in the present case.

¶ 103. A death-in-prison sentence is the most severe penalty authorized in Wisconsin. This penalty means that "whatever the future might hold in store for

the mind and spirit of [the young juvenile], he will remain in prison for the rest of his days."[1] A death-in-prison sentence is an especially severe punishment, made harsher for a young juvenile 14 years old or younger because of the increased time and proportion of life that the juvenile will serve in prison.[2]

¶ 104. I conclude, as has the United States Supreme Court, that the differences between juveniles and adults mean that juvenile offenders "cannot with reliability be classified among the worst offenders." *Roper v. Simmons*, 543 U.S. 551, 569 (2005); *see also Graham v. Florida*, 130 S. Ct. 2011, 2026 (2010).[3] Retribution is a legitimate penological goal, but retribution "must be directly related to the personal culpability of the criminal offender." *Graham*, 130 S. Ct. at 2028. "[T]he case for retribution is not as strong with a minor as with an adult." *Graham*, 130 S. Ct. at 2028 (quoting *Roper*, 543 U.S. at 569–70). Accordingly, I conclude, as the nonparty brief of the Wisconsin Council on Children and Families urges, that the United States Supreme Court's analysis in *Roper* and *Graham* supports the holding that a juvenile cannot be sentenced to life without parole for a homicide committed when 14 years old or younger.

¶ 105. I discuss first the presumption of constitutionality and second the constitutional issue presented.

---

[1] *Naovarath v. State*, 779 P.2d 944, 944 (Nev. 1989).

[2] *Graham v. Florida*, 130 S. Ct. 2011, 2027–28 (2010).

[3] The three general differences are: (1) juveniles have a lack of maturity and an underdeveloped sense of responsibility resulting in impetuous and ill-considered actions and decisions; (2) juveniles are more susceptible to negative influences and outside pressures; and (3) the character of a juvenile is not as well formed as that of an adult. *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005).

I

¶ 106. The majority opinion relies heavily on the presumption of constitutionality. I conclude that no presumption of constitutionality applies in the present case.

¶ 107. This case does not involve, as the majority opinion claims, an attack on the constitutionality of Wis. Stat. § 938.183(1)(am), which provides that courts of criminal jurisdiction have original jurisdiction over "a juvenile who is alleged to have attempted or committed a violation of s. 940.01 . . . on or after the juvenile's 10th birthday." Nor does this case involve an attack on the constitutionality of the first-degree homicide statute, Wis. Stat. § 940.01, or the penalties that apply to that statute.

¶ 108. Instead, this case involves a challenge to the application of those statutes to a category of individuals, namely a challenge to a death-in-prison sentence for a juvenile who committed an intentional homicide when 14 years old or younger.

¶ 109. A "categorical challenge" is, in my opinion, an "as applied" challenge. Stating the challenge as a categorical challenge is just a different way of stating an "as applied" challenge. In other words, the present case can be denominated a "categorical challenge" or can be denominated an "as applied" challenge. They are the same in the present case. The former challenge is stated as a challenge to the application of the statutes to all 14–year-olds who commit intentional homicide. The latter challenge is stated as a challenge to the application of the statutes to Ninham solely because he was 14 years old when he committed intentional homicide. Of course, a decision saying that the statutes cannot be

applied to Ninham solely because he is 14 years old would apply to all other 14–year-olds who commit intentional homicide.

¶ 110. According to *Tammy W.-G. v. Jacob T.*, 2011 WI 30, ¶ 49, 333 Wis. 2d 273, 797 N.W.2d 854 (in which I join Justice Bradley's dissent), "no presumption [of constitutionality exists] in regard to whether the statute was *applied* in a constitutionally sufficient manner." (emphasis added). Rather, the constitutional analysis to be applied, according to *Tammy W.-G.*, to "an as-applied challenge" "differs from case to case, depending on the constitutional right at issue."

¶ 111. The majority's reliance (¶ 44) on a strong presumption of constitutionality of the statute is therefore contrary to *Tammy W.-G.*, 2011 WI 30, ¶ 49, and *Roper*, 543 U.S. at 563. On the basis of *Tammy W.-G.*, the majority should be holding that no presumption of constitutionality applies in the present case.

¶ 112. Moreover, a presumption of constitutionality is not relevant in the present case, in which the constitutional right at issue is the Eighth Amendment prohibition against cruel and unusual punishment. In cases involving categorical challenges under the Eighth Amendment, a court exercises its own independent judgment, considering the culpability of the offender and the nature of the offense, the relationship of the challenged sentencing practice to penological goals, and society's evolving standards of decency. *Roper*, 543 U.S. at 563–64; *Graham v. Florida*, ___ U.S. ___, 130 S. Ct. 2011, 2022 (2010). How can there be a presumption of constitutionality when the court is not only exercising its own independent judgment but doing so on the basis of, inter alia, evolving standards of decency?

¶ 113. Thus, in contrast to the majority, I conclude that no presumption of constitutionality applies in the present case.

¶ 114. I turn now to the constitutional issue presented.

## II

¶ 115. The Eighth Amendment, applicable to the States through the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

¶ 116. The Eighth Amendment's prohibition against cruel and unusual punishment is amorphous. Cruel and unusual punishment is not defined or delineated in the federal Constitution. Rather, the United States Supreme Court has declared that what constitutes cruel and unusual punishment changes with society's views: The Eighth Amendment's protection against cruel and unusual punishment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society."[4] Thus the Eighth Amendment's prohibition against cruel and unusual punishment is not a constant. The prohibition is constantly evolving, reflecting the changes in society.

¶ 117. Over the last decade, the United States Supreme Court has been developing the "evolving standards of decency" central to the analysis of the Eighth Amendment for juveniles and those whose intellectual capacity is not that of an adult.

¶ 118. The United States Supreme Court has categorically prohibited a death penalty sentence for indi-

_____

[4] *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).

394

viduals whose intellectual functioning is in a low range. *Atkins v. Virginia*, 536 U.S. 304 (2002).

¶ 119.   The United States Supreme Court has categorically prohibited a death penalty sentence for juveniles who committed their crimes before the age of 18. *Roper v. Simmons*, 543 U.S. 551 (2005).[5]

¶ 120.   The United States Supreme Court has categorically prohibited a death-in-prison sentence for juveniles (under 18 years) who committed non-homicide crimes. *Graham v. Florida*, 130 S. Ct. 2011 (2010).

¶ 121.   A next logical question is whether a death-in-prison sentence for a juvenile who committed an intentional homicide crime is categorically prohibited.[6] The United State Supreme Court has yet to take up the following issue: whether a death-in-prison sentence for a juvenile 14 years old or younger who committed an intentional homicide is categorically prohibited.

¶ 122.   The United States Supreme Court has recognized that juvenile offenders are less culpable than adult offenders and generally the younger the juvenile offender, the more his or her culpability diminishes.[7] *See also* majority op., ¶ 74.

¶ 123.   The   task   of   interpreting   the   Eighth Amendment remains the court's task. "The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the

---

[5] *See also Thompson v. Oklahoma*, 487 U.S. 815 (1988) (categorically prohibiting the death penalty for a crime committed by a juvenile while under the age of 16).

[6] *See* Adam Liptak & Lisa Faye Petak, *Juvenile Killers in Jail for Life Seek a Reprieve*, N.Y. Times, Apr. 21, 2011, at A13.

[7] *Graham*, 130 S. Ct. at 2026; *Roper*, 543 U.S. at 569.

severity of the punishment in question. In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals."[8]

¶ 124.  Recognizing that juveniles have less culpability than adults and so are less deserving of the most severe punishments, the United States Supreme Court has declared unconstitutional under the Eighth Amendment severe penalties imposed on juveniles.[9] "The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential." *Graham*, 130 S. Ct. at 2032.

¶ 125.  Case law and the research on which case law is based teach that there are marked differences between juvenile offenders and adult offenders in their cognitive abilities.[10] "The difference in mental development between a child and an adult . . . is a major premise of the United States Supreme Court's decisions in *Roper* and in *Graham* . . . ."[11] Juveniles, and especially young juveniles, categorically have lessened culpability.[12] The nonparty brief of the Wisconsin Psychiatric and the Wisconsin Psychological Associations, recognizing this marked and well understood differ-

---

[8] *Graham*, 130 S. Ct. at 2026 (citations omitted). The penological goals are retribution, deterrence, incapacitation, and rehabilitation. None justifies a death-in-prison sentence for a 14–year-old child.

[9] *Graham*, 130 S. Ct. at 2026; *Roper*, 543 U.S. at 569.

[10] This accepted distinction has led to a continued trend in recent years of trying fewer teenage defendants in adult courts. *See* Mosi Secret, *States Try Fewer Teenage Defendants in Adult Courts*, N.Y. Times, Mar. 6, 2011, at A1.

[11] *Missouri v. Andrews*, 329 S.W.3d 369, 379 (Mo. 2010) (Wolff, J., dissenting).

[12] *Graham*, 130 S. Ct. at 2032; *Roper*, 543 U.S. at 572–73.

ence, advises that "[w]ell accepted psychology and psychiatry studies, including those upon which *Roper* and *Graham* relied in holding that juveniles cannot be deprived of their liberty irretrievably, require that the judgment sentencing Omer Ninham to life imprisonment without parole be vacated."

¶ 126. Wisconsin law has similarly recognized that young juveniles under the age of 15 are unprepared for adult responsibilities and should be treated as a distinct group of juveniles in need of protection.[13]

¶ 127. The case law and the research on which the cases are based teach that caution should be used in allowing a judge to decide at sentencing that a young juvenile is incorrigible or has an "irretrievably depraved character."[14] " '[I]ncorrigibility is inconsistent with youth.' "[15] A ruling that a juvenile who committed a homicide at the age of 14 does not have the capacity to ever mature and reform or be reincorporated in society is categorically untrustworthy. "If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise, from assessing any juvenile under 18 as having antisocial personality disorder, we conclude that States should refrain from

---

[13] Juveniles under 15 years of age may be held in secure custody only in a juvenile detention center or the juvenile portion of a county jail. Wis. Stat. §§ 302.18(7), 938.138(1m)(a).

Fourteen-year-olds are incapable of consenting to sexual activity. Wis. Stat. §§ 948.01, 948.02, & 948.09. Fourteen-year-old crime victims also receive extra protections under certain sexual offense statutes. Wis. Stat. §§ 948.02, 948.09, 948.075, 967.04.

[14] *Graham*, 130 S. Ct. at 2026.

[15] *Graham*, 130 S. Ct. at 2029 (quoting *Workman v. Commonwealth*, 429 S.W.2d 374, 378 (Ky. 1968)).

397

asking jurors to issue a far graver condemnation . . . ."[16] More complete and accurate information is needed about the child (and the adult that he or she may become) because "[e]xperience has taught us to be cautious when reaching high consequence conclusions about human nature that seem to be intuitively correct at the moment." *State v. Gallion*, 2004 WI 42, ¶ 36, 270 Wis. 2d 535, 678 N.W.2d 197.

¶ 128.    In addition to the culpability of juveniles, a court must consider the "objective indicia of society's standards, as expressed in legislative enactments and state practice."[17] The majority opinion concludes that no national consensus exists against sentencing a 14-year-old or younger juvenile to death in prison for intentional homicide. Majority op., ¶ 57. I examine the data and come to the opposite conclusion.

¶ 129.    That 36 states allow a juvenile 14 years old or younger to be sentenced to death in prison for the crime of homicide does not undermine a national consensus against the practice. Three states have now moved away from death-in-prison sentences for juveniles.[18] However, the absence of legislation prohibiting a particular sentence is not conclusive evidence of society's current standard of decency. In addition to legislation, "[a]ctual sentencing practices are an important part of the inquiry into consensus." *Graham*, 130 S. Ct. at 2023.

---

[16] *Roper*, 543 U.S. at 573.

[17] *Graham*, 130 S. Ct. at 2022 (quoting *Roper*, 543 U.S. at 572).

[18] California (*In re Nunez*, 93 Cal. Rptr. 3d 242 (Cal. Ct. App. 2009)); Colorado (Colo. Rev. Stat. § 17–22.5–104(IV)); Texas (Tex. Penal Code Ann. § 12.31(b)(1)).

¶ 130. The extreme infrequency with which death-in-prison sentences are imposed on children for homicides committed when 14 years old or younger demonstrates that there is a national consensus against such sentences. Only 73 juveniles in 18 states are serving a death-in-prison sentence for homicide committed when 14 years old or younger. Majority op., ¶ 56. Sixteen states have a sentencing statute that results in mandatory death-in-prison sentences for juveniles that commit intentional homicide.[19] In contrast, according to statistics supplied by the defendant's brief based on data from the Wisconsin Office of Justice Assistance, since 1995 1,153 juveniles were arrested in Wisconsin for murder, and only Omer Ninham has been sentenced to life in prison without parole for a homicide committed when 14 years old or younger.

¶ 131.  The national data on sentencing practices analyzed in the instant case are significantly similar to the data in *Graham* regarding the imposition of sentences of life without parole for juveniles who committed non-homicide crimes. In *Graham*, 123 juveniles in 11 states were serving life-without-parole sentences for non-homicide cases, *Graham*, 130 S. Ct. at 2011, and the United States Supreme Court found a national consensus that a sentence of death in prison for non-homicide cases was cruel and unusual punishment.[20]

¶ 132.  Just as the United States Supreme Court determined in *Graham* that there was a national consensus against juveniles being sentenced to life without

---

[19] *Andrews*, 329 S.W.3d at 383 (Wolff, J., dissenting).

[20] Similarly, as asserted by Ninham, the absolute numbers of the sentence before this court are substantially comparable to the pertinent number of sentences in *Roper* (72) and in *Atkins* (71). *See* Brief of Defendant-Appellant-Petitioner Omer Ninham at 24–25.

parole for non-homicide crimes, I conclude on the basis of the infrequency with which death-in-prison sentences are imposed for homicides committed by juveniles under 15 that there is a national consensus against death-in-prison sentences for homicide crimes committed when a juvenile is 14 years old or younger. The national consensus against such sentences strongly supports the conclusion that such sentences are cruel and unusual.

¶ 133. Applying the rationale used by the United States Supreme Court in Eighth Amendment cases, I conclude that the Wisconsin statute allowing the imposition of a death-in-prison sentence for a homicide committed when a juvenile is 14 years old violates the constitutional prohibition of cruel and unusual punishment. This case lies on the boundaries of an evolving standard of decency that underlies the analysis of Eighth Amendment rights. Applying the analyses the Supreme Court applied in *Graham* and *Roper*, consistent with the analysis the Court applied in *Atkins*[21] and *Thompson*,[22] and the historic recognition under Wisconsin law of the vulnerability of young juveniles, I conclude that a death-in-prison sentence for an intentional homicide committed when a juvenile is 14 years old or younger is unconstitutional.

¶ 134. My conclusion is buttressed by the same kind of research-based evidence that the United States Supreme Court has relied upon to declare: (1) juveniles categorically have lessened culpability; (2) juveniles are more capable of change than adults and their actions are less likely to evidence "irretrievably depraved character" such that a decision at sentencing

---

[21] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[22] *Thompson v. Oklahoma*, 487 U.S. 815 (1988).

could be made that they are incapable of reconciliation with society; (3) penological justifications do not support a sentence that denies all hope for reconciliation with society; and (4) the sentence of death in prison is especially harsh on young juveniles.

¶ 135. Just as society's standards of decency categorically do not allow a juvenile to be sentenced to death, juveniles 14 years old or younger should not be sentenced to death in prison.

¶ 136. Omer Ninham's sentence guarantees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the heinous act he committed as a 14–year-old is not representative of his true character.[23] I conclude the death-in-prison sentence subjecting the 14–year-old to "hopeless, lifelong punishment and segregation is not a usual or acceptable response to childhood criminality, even when the criminality amounts to murder."[24]

¶ 137. For the reasons set forth, I dissent.

¶ 138. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

---

[23] *Graham*, 130 S. Ct. at 2027; *Naovarath*, 779 P.2d at 944.
[24] *Naovarath*, 779 P.2d at 947.