COURT OF APPEALS
DECISION
DATED AND FILED

December 13, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP820-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF235

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

JOHN H. THILLEMANN,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Kenosha County: BRUCE E. SCHROEDER, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. John H. Thillemann appeals a judgment of conviction for repeated sexual assault of the same child and an order denying his motion for postconviction relief. Thillemann argues law enforcement involuntarily obtained his consent to search his residence, asserting his consent was a condition of police allowing him access to needed medication. He further asserts he was entitled to an evidentiary hearing on his ineffective assistance of counsel claim, which was predicated upon his attorney's failure to present evidence regarding the medical necessity of the medication. Next, Thillemann argues he gave incriminating statements while in custody and without knowingly and intelligently waiving his *Miranda* rights.[1] Finally, he asserts his sentence was unduly harsh. For the reasons that follow, we reject Thillemann's arguments and affirm.

## BACKGROUND

¶2 Law enforcement responded to a report of an altercation between two individuals and found the seventy-two-year-old Thillemann nearby. Thillemann flagged down the police squad and asked to get in the back seat, telling the officer "You're looking for me. He said I molested his daughter." Thillemann was transported a short distance and left in the back seat while officers interviewed the complainant, who indeed accused Thillemann of sexually abusing seven-year-old Layla.[2]

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] Consistent with the policy underlying WIS. STAT. RULE 809.86 (2021-22), we refer to the victim using a pseudonym. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶3 After about forty-five minutes, deputy Michael Pittsley checked on Thillemann in the vehicle. As set forth in more detail below, Thillemann informed Pittsley he was diabetic and needed insulin. Pittsley told Thillemann he would retrieve the medication from Thillemann's residence. A short time later, Pittsley returned and told Thillemann, "I have no problem going into your house to get your insulin, obviously it's a medical reason, but … I was wondering while I was in there if you would mind if I just looked around real quick?" Thillemann replied, "No, go ahead." Pittsley then read Thillemann his *Miranda* rights and a consent-to-search form. Thillemann signed the form.

¶4 Minutes later, an officer returned with the insulin and helped administer it. Thillemann remained in the back seat, and after a short time sergeant Neil Paulsen approached Thillemann to ask about the allegations against him. Following a brief dialogue, Thillemann admitted that he had touched Layla's vagina over her clothing "maybe three times" over the course of six months. During the questioning, Thillemann had interjected, "But wait a minute, don't I have to have an attorney?" Paulsen responded, "No, you're not under arrest."

¶5 Thillemann was charged and filed a motion to suppress both the fruits of the consent search of the residence and the inculpatory statements he made while in the police squad. Thillemann argued the search of his residence was invalid because the administration of needed medication was conditioned on his consent to search. Thillemann also argued his confession was obtained without a voluntary waiver of his *Miranda* rights, as he was suffering from low blood sugar at the time and did not understand the rights he was giving up. Thillemann's final argument was that the waiver was involuntary because he was "misinformed, or at least misled," by Paulsen's response to his question about needing an attorney.

¶6      The circuit court held an evidentiary hearing on the motion, at the conclusion of which it determined that none of Thillemann's rights had been violated. The court concluded Thillemann validly gave consent to search his residence. It also concluded *Miranda* warnings were unnecessary because the questioning was noncustodial. Finally, the court remarked that "the evidence does not sustain any finding on my part about the degree of impairment that he suffered from his diabetes." Thillemann then entered a guilty plea and was sentenced to thirty-eight years' imprisonment, bifurcated as twenty-one years of initial confinement and seventeen-years of extended supervision

¶7      Thillemann subsequently sought to withdraw his plea. As grounds, Thillemann alleged that his trial counsel was constitutionally deficient for failing to present medical evidence at the suppression hearing regarding his need for insulin. Alternatively, he sought resentencing because the circuit court imposed an unduly harsh sentence that was the "functional equivalent of a life sentence." The court denied the motion, adopting in full the response brief submitted by the State as its rationale. Thillemann now appeals.

## DISCUSSION

¶8      Thillemann raises four issues on appeal. First, he argues his consent to search his residence was involuntary because it was procured as a condition of him receiving necessary medication for his diabetes. Second, he argues his trial counsel was constitutionally ineffective for failing to present medical evidence about his need for the medication. Third, Thillemann asserts the State failed to demonstrate that he knowingly and intelligently waived his *Miranda* rights. Finally, he contends the circuit court erroneously exercised its sentencing discretion by imposing an unduly harsh sentence.

4

*I. Voluntariness of Consent to Search*

¶9        Consent is a well-established exception to the warrant requirements found in the state and federal constitutions.  **State v. Artic**, 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430.  Here, there is no dispute that Thillemann gave his consent to search.    He argues, however, that the consent was obtained involuntarily.

¶10        Voluntariness as a concept escapes precise definition.  **Id.**, ¶32; *see also* **Schneckloth v. Bustamonte**, 412 U.S. 218, 224-225 (1973).  We must be satisfied that the consent was a free and unconstrained choice, not the product of express or implied coercion or duress.  **Artic**, 327 Wis. 2d 392, ¶32**.**  Our determination is a mixed question of fact and law based upon an evaluation of the totality of the surrounding circumstances.  **Id.**    Several non-exclusive factors inform this determination, including: the police use of trickery, deception, or misrepresentation; whether the police physically threatened or intimidated the defendant or punished him or her by depriving the defendant of basic needs (e.g., food and sleep); whether the circumstances attending the request to search were congenial and cooperative; the defendant's response to the request to search; the defendant's characteristics, including age, education, intelligence, physical and emotional condition, and prior experience with the police; and whether the police informed the defendant that he or she could refuse consent.  **Id.**, ¶33.

¶11        Considering the totality of the circumstances here, we agree with the circuit court that Thillemann's consent to search reflects a free and unconstrained choice to cooperate, independent of any coercive element related to his need for medication.  Thillemann focuses on the fact that just before he signed the form, Pittsley told him: "So I just want to look around just to put my mind at ease on a

few things, and then I'll bring your insulin out right away." In Thillemann's view, the adverb "and then" signifies that Thillemann's consent to search was a condition of his receiving the insulin he requested. This, Thillemann argues, rendered his consent involuntary.

¶12 Curiously, the parties omit reference to another exchange that occurred between Thillemann and an unidentified officer. The exchange occurred between the time when Thillemann had requested that Pittsley retrieve his insulin and the time when Pittsley returned with the consent-to-search form. Thillemann asked the unidentified officer about the status of his medication. After checking with the other officers, the unidentified officer informed Thillemann, "We're just trying to figure this out. He's just going to have you sign something to allow him to go in and grab it for you."

¶13 Despite these two statements, law enforcement took adequate steps to advise Thillemann that his receipt of medication was not contingent upon him consenting to the search. Thillemann was present in the police squad at his own request and the entire encounter was cooperative. Pittsley initially made contact with Thillemann to ensure that Thillemann was doing okay.

¶14 During that initial conversation, Pittsley was receptive to Thillemann's request for insulin. He asked where Thillemann's residence was, where the insulin was located, what kind of dosage Thillemann required, if anyone else was at the residence, and if Thillemann had the keys to the residence on him. Thillemann responded appropriately to each question and then asked whether he would be "transport[ed]," with Pittsley responding that he had "no idea." At the

conclusion of the conversation, Pittsley appears to tell Thillemann an officer would get his insulin for him "right now."[3]

¶15      The intervening statement by the unidentified officer that Pittsley was "going to have you sign something to allow him to go in and grab it for you" would be, standing alone, somewhat problematic.  However, Pittsley minutes later dispelled any notion that Thillemann's consent to search was a required condition of him obtaining medication.  When Pittsley returned with the consent-to-search form, he told Thillemann, "I have no problem going into your house to get your insulin, obviously it's a medical reason, but … I was wondering while I was in there if you would mind if I just looked around real quick?"  Thillemann replied, "No, go ahead."  The foregoing demonstrates that, even before the "and then" statement on which Thillemann relies, he had been apprised he would receive the medication regardless of whether he consented to the search.

¶16      Events subsequent to that verbal consent also indicate that it was Thillemann's free and unconstrained choice to allow the police to search while they were retrieving his insulin.  Pittsley then described the consent-to-search form and told Thillemann, "[I]f you're willing, I would like you to sign it just saying that you realize you're giving me this consent."  Pittsley added that for Thillemann to fully understand the consent form, Pittsley was going to provide *Miranda* warnings,[4] clarifying that at the time Thillemann was "not arrested, not in trouble

---

[3]  Pittsley's precise words are somewhat difficult to discern in the video recording.

[4]  The consent-to-search form included a provision acknowledging that the consenting individual had been apprised of his or her constitutional rights.

for anything, not being charged, but I just want you to be aware of your constitutional rights."

¶17 After reading Thillemann the *Miranda* warnings, Pittsley read the consent-to-search form aloud in its entirety, including the provision acknowledging that Thillemann could refuse his consent. Immediately preceding the "and then" statement, Pittsley also read the provision acknowledging that the permission to search was "being given by me … voluntarily and without threats, promises or coercion of any kind."

¶18 In sum, the totality of the circumstances demonstrate that Thillemann provided voluntary consent to search his residence. He did so verbally, before the "and then" statement which he now contends rendered his consent involuntary. Thillemann was then advised that police recognized the "medical reason" for his request for insulin and had "no problem" going into his residence to retrieve it. These statements, as well as Pittsley's statement that he wanted to search "while I was in there," unambiguously conveyed that Pittsley was going to get insulin regardless of whether Thillemann consented to the search. Finally, the search form read to Thillemann made clear both that Thillemann could refuse consent and that police were not threatening him with anything to obtain his consent. The circuit court properly denied Thillemann's motion to suppress the fruits of the search.

## II. *Ineffective Assistance of Counsel*

¶19 The next issue centers on whether Thillemann was actually in medical distress at the time he gave his consent to search, which could affect the

voluntariness inquiry. The circuit court, when denying Thillemann's suppression motion, observed that other than Thillemann's statements,[5] there was no evidence presented on this front. Thillemann sought plea withdrawal based on ineffective assistance of trial counsel, asserting his attorney should have presented medical evidence to confirm that he needed insulin to treat his diabetes. He contends that, but for the absence of such evidence, his suppression motion would have been granted and he would not have pled guilty. The circuit court denied Thillemann's postconviction motion without an evidentiary hearing, which he contends he is entitled to.

¶20 If a postconviction motion on its face alleges facts that would entitle the defendant to relief, the circuit court has no discretion and must hold an evidentiary hearing. *State v. Bentley*, 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996). Whether a motion alleges facts that, if true, would entitle a defendant to relief is a question of law that we review de novo. *Id.*

¶21 A defendant is entitled to withdraw a guilty plea after sentencing only by demonstrating that a "manifest injustice" has occurred. *Id.* at 311. The denial of constitutionally effective assistance by counsel can constitute a manifest injustice. *Id.* The two-part test under *Strickland v. Washington*, 466 U.S. 668 (1984), applies to challenges to guilty pleas based on ineffective assistance of counsel. *Bentley*, 201 Wis. 2d at 311-12. *Strickland*, in turn, requires that the defendant demonstrate both deficient performance on the part of his or her trial counsel and prejudice in the sense that there is a reasonable probability that, but

---

[5] While signing the form, Thillemann stated, "This is not good. I know it's low sugar now," and he was mistaken about the date.

for counsel's errors, the defendant would not have pled guilty and would have insisted on going to trial. ***Bentley***, 201 Wis. 2d at 312.

¶22    Thillemann contends that he met this standard by submitting a report from Dr. Samantha Pabich, an Assistant Professor at the University of Wisconsin School of Medicine and Public Health. As an initial matter, we note that Thillemann's theory as to the significance of her anticipated testimony flows from the incorrect premise that "the officer did not provide an option for Mr. Thillemann to obtain his prescribed insulin without consenting" to the search. As we have extensively set forth, this is a flawed characterization of the dialogue between Pittsley and Thillemann.

¶23    Even beyond that, Pabich's report fails to substantiate any kind of significant vulnerability or altered mental state that would affect the voluntariness analysis set forth above. Thillemann was prescribed 70/30 insulin,[6] with thirty-five units to be taken in the morning and fifty-four units to be taken in the evening. Pabich noted that Thillemann's first insulin dose was taken at 8 a.m.; his next dose "would likely have been due around 8-12 hours later with supper." Thillemann highlights Pabich's observation that he was "invested in diabetes control" and regularly checked his blood sugars. Thillemann also points to Pabich's conclusion that he "must have believed himself to be hyperglycemic as he desired Insulin."

¶24    Pabich's report, however, takes a decidedly skeptical view of the notion that Thillemann was experiencing adverse diabetic effects at the time he provided consent to search. For Thillemann, hyperglycemic episodes "were likely

---

[6] 70/30 insulin is comprised of 70% long-acting insulin and 30% short-acting insulin.

rare or non-existent." Pabich therefore found it unlikely that Thillemann believed himself to be in a life-threatening situation due to hyperglycemia.

¶25 While Pabich allowed that Thillemann could have experienced mild hyperglycemia, she opined that he was not suffering from severe hyperglycemia, which "would have required advanced medical intervention for symptoms to resolve." Moreover, Pabich concluded Thillemann's blood sugars were unlikely to be high or low enough to cause an "altered mental status." Pabich stated the insulin was not designed to treat acute hyperglycemia or to be taken without food, "so using it in these situations would be inappropriate." In conclusion, Pabich opined that the "degree of hyperglycemia he was experiencing (though this exact number is unknown) was unlikely to cause significant alterations in judgment, and would likely have been inappropriately treated with the type of insulin he was hoping to access."

¶26 Based on the contents of Pabich's report, Thillemann has failed to demonstrate a reasonable probability that his suppression motion would have been granted had Pabich's opinions been introduced into evidence, and he has therefore failed to demonstrate a reasonable probability that he would not have pled guilty. The postconviction motion fails on its face to establish a manifest injustice that would warrant plea withdrawal, and the circuit court properly denied it without an evidentiary hearing.

III. *Validity of **Miranda** Waiver*

¶27 Relying on Paulsen's response to his "don't I have to have an attorney" question, Thillemann next argues his inculpatory statements to police should have been suppressed as being elicited without a valid ***Miranda*** waiver. The threshold question in this analysis is whether Thillemann was subjected to

11

"custodial interrogation," which triggers the obligation to safeguard the person's privilege against self-incrimination. *See Miranda*, 384 U.S. at 444.

¶28    A person is in custody for *Miranda* purposes if there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest. *State v. Dobbs*, 2020 WI 64, ¶53, 392 Wis. 2d 505, 945 N.W.2d 609. To make this determination, we review the totality of the circumstances, including the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint. *Id.*, ¶54.

¶29    The standard is an objective one; we do not credit the subjective view of the suspect, who may assume that he or she is being arrested because there are grounds to do so. *State v. Quigley*, 2016 WI App 53, ¶42, 370 Wis. 2d 702, 883 N.W.2d 139. Whether a person was in custody for purposes of *Miranda* is a question of law that we review de novo. *Dobbs*, 392 Wis. 2d 64, ¶28. However, we will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.*

¶30    Thillemann concedes he was not in custody when he invited himself into the back of the police squad. He argues, however, that the situation became custodial because he was seated in the squad car for about an hour, officers were always nearby when the squad doors were open, he was administered *Miranda* warnings, and he was questioned in the vehicle.

¶31    For the reasons set forth in the State's brief, we conclude Thillemann was not in custody when he incriminated himself in the police squad. During the initial dialogue with Pittsley, Thillemann insinuated he might be "transport[ed]," to which Pittsley responded, "I have no idea." Pittsley told Thillemann less than

fifteen minutes prior to the questioning that he was not under arrest or even in trouble for anything at that time.

¶32    The circumstances did not suggest otherwise to Thillemann. His presence in the squad was by his own volition; in fact, when Pittsley asked him to get out of the vehicle, Thillemann declined. Officers never used force, displayed their firearms, or handcuffed Thillemann. The squad doors were closed while officers were speaking with the complainant, but otherwise the doors were "frequently" open. Officers stood near the vehicle while they were speaking with Thillemann, but Thillemann never tried to leave the vehicle.

¶33    Thillemann also relies on the fact that he was not permitted to retrieve the insulin from his apartment himself. Based on our review of the appellate record, it appears no one ever forbid Thillemann from returning to his apartment to get his insulin; he asked an officer to retrieve it for him. To the extent that exchange suggests Thillemann viewed himself as being in custody, his subjective views are irrelevant.

¶34    Nonetheless, the State appears to concede that Thillemann would not have been permitted to return to his residence if he had tried. But Thillemann's inability to access his apartment during an active investigation does not establish he was in custody for purposes of *Miranda*. As the circuit court observed, he was not prevented from leaving to go elsewhere, including a pharmacy. The totality of the circumstances demonstrates that Thillemann was not subjected to custodial interrogation while in the police squad.

*IV. Exercise of Sentencing Discretion*

¶35    A circuit court has the authority to review its sentencing determination to decide whether it erroneously exercised its discretion by imposing a sentence that was unduly harsh, excessive, or unconscionable. *State v. Klubertanz*, 2006 WI App 71, ¶32, 291 Wis. 2d 751, 713 N.W.2d 116. "A sentence is unduly harsh or unconscionable 'only where the sentence is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances.'" *State v. Cummings*, 2014 WI 88, ¶72, 357 Wis. 2d 1, 850 N.W.2d 915 (*quoting* *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975)).

¶36    We review the circuit court's conclusion that the sentence it imposed was not unduly harsh or unconscionable for an erroneous exercise of discretion. *Id.*, ¶45. We will uphold a court's exercise of discretion as long as it applied the proper legal standard to the facts of record and, through a rational process, reached a reasonable conclusion. *Id.*

¶37    Because Thillemann was age seventy-two when he was sentenced, the parties focus almost exclusively on the initial confinement portion of the sentence. Thillemann argues that the twenty-one-year period of initial confinement is the "functional equivalent" of a life sentence given his age and reduced life expectancy as a result of his diabetes. Citing *State v. Ninham*, 2011 WI 33, ¶75, 333 Wis. 2d 335, 797 N.W.2d 451, Thillemann asserts that a sentence of life without parole is the "most severe penalty recognized under Wisconsin

law" and should be reserved for the most culpable offenders who commit the most serious offenses.[7] In general, Thillemann highlights the mitigating factors of his case, such as the fact that he had only two prior misdemeanor offenses, was cooperative, and was assessed as a low risk of recidivism during the presentence investigation.

¶38 We conclude Thillemann's sentence was not unduly harsh, nor does it violate the principle that the court should impose the least amount of confinement consistent with the protection of the public, the gravity of the offense, and the defendant's rehabilitative needs. *See State v. Gallion*, 2004 WI 42, ¶44, 270 Wis. 2d 535, 678 N.W.2d 197. The twenty-one-year period of initial confinement was about half of the maximum initial confinement term available to the circuit court. *See* WIS. STAT. § 973.01(2)(b)1. (forty-year period of initial confinement available for a Class B felony). A sentence well within the maximum is presumptively not unduly harsh. *State v. Grindemann*, 2002 WI App 106, ¶32, 255 Wis. 2d 632, 648 N.W.2d 507.

¶39 Thillemann has not persuaded us that the presumption is overcome in this case. The circuit court acknowledged the mitigating factors that Thillemann raises—including that Thillemann had "a decent working history and he served our country honorably in combat in Vietnam." The court also acknowledged Thillemann's scant offense history, although it noted Thillemann's disorderly conduct conviction arose from circumstances in which Thillemann

---

[7] The court in *State v. Ninham*, 2011 WI 33, ¶75, 333 Wis. 2d 335, 797 N.W.2d 451, observed that life without parole is actually the second-most severe penalty available generally at law. The "most severe penalty" and "extreme culpability" language Thillemann relies on was derived from the court's discussion of *Roper v. Simmons*, 543 U.S. 551 (2005), which was a death penalty case.

exhibited "grooming-type behavior" toward two minor females. The court nonetheless determined that "the conduct for which he is here now … demands that he be dealt with very sternly."

¶40 Thillemann's reliance on life expectancy tables to dictate the contours of the circuit court's exercise of discretion produce an absurd result in this case. Thillemann notes that the life expectancy of a seventy-year-old white male is eighty-four, and his diabetes diagnosis reduces his life expectancy by up to ten years. If we were to treat this information as controlling, almost *any* period of initial confinement for the seventy-two-year-old Thillemann could be regarded as a "life sentence." Yet Thillemann urged the circuit court to limit the term of initial confinement to between seven and nine years, explicitly acknowledging that even this amount of time "create[d] the very real possibility that he is [g]oing to die in prison." While the twenty-one-year initial confinement term imposed increases that likelihood, we reject the notion that an erroneous exercise of discretion occurs by definition when an elderly offender commits a serious crime and is sentenced accordingly.

¶41 Thillemann counters that his twenty-one-year sentence was longer than necessary to protect the public given the potential availability of a WIS. STAT. ch. 980 commitment.[8] Thillemann's data pertaining to the effects of aging on recidivism is of limited persuasive value when the index offense occurs at age

---

[8] WISCONSIN STAT. ch. 980 authorizes the indefinite commitment of sexually violent persons who are more likely than not to reoffend in the future.

seventy-two, an age at which—according to the very report Thillemann relies on—most individuals have aged out of criminal conduct.[9]

¶42 Moreover, while a WIS. STAT. ch. 980 commitment might ameliorate future dangerousness, it does not address other valid sentencing objectives, including punishment, rehabilitation, and deterrence. *See **Gallion***, 270 Wis. 2d 535, ¶40. The circuit court in fact emphasized these other objectives, reasoning that Thillemann's conduct warranted a significant sentence "not only as a lesson to him and as a safeguard for the population, but as an example to others who are motivated to do something like this."

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[9] *See* U.S. SENTENCING COMM'N, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS 11 & n.12 (2017) (documenting 2016 arrests by age). Additionally, the 2.1% recidivism rate cited in Thillemann's reply brief is inaccurate. According to the report, the rearrest rate for study offenders age 60 or older was 16.4%. *Id.* at 22. The table to which Thillemann refers shows the composition of the recidivism study group, 2.1% of which were age 65 or older at the time of release. *Id.* at 14.